[No. S004489, Crim. No. 22960. Jan. 12, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE PERRY FARMER, JR., Defendant and Appellant.

898

COUNSEL

James F. Johnson, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John W. Carney, Pat Zaharopoulos and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190.1 et seq.). As we shall explain, we conclude the judgment must be affirmed as to guilt but reversed as to penalty.

Erich Schmidt-Till returned home from his job at a restaurant in Riverside at approximately 1 a.m. About three hours later, a neighbor went to investigate a moaning sound emanating from the apartment. He found the screen removed from an open window; peering inside, he saw Schmidt-Till lying on the floor and summoned the police.

At roughly the same time, the police received another call from a woman who claimed that her brother had called to tell her he had been shot. After alerting patrolmen, an ambulance, and the fire department, the police dispatcher telephoned Schmidt-Till. The victim was able to inform her that he had been shot three times in the mouth and stomach. He identified his assailant as a White male of approximately 35 years of age and added that he knew him but could not remember his name.

Officer Strigotte and his colleagues were the first to arrive on the scene. They cautiously entered the sparsely illuminated apartment. Strigotte located Schmidt-Till with his flashlight and administered first aid. The victim was lucid enough to respond to some questions. He said that he had been awakened by a noise and had confronted an intruder, who shot him in response to queries about what he was doing there. He described the assailant to Strigotte. The man had previously visited the apartment to engage in drug transactions with his roommate, Lloyd Reed. Schmidt-Till speculated that the man had entered the apartment hoping to steal drugs from Reed. Schmidt-Till tried several times to recall the man's name, asking Officer Strigotte to find a "phone book" containing the name, but the officer could not locate it. The ambulance arrived soon afterwards; at the hospital a few hours later Schmidt-Till succumbed to his injuries.

The "phone book" was apparently a yellow note pad with a list of names and telephone numbers maintained by Reed. Three persons on this list fit

the general description of Schmidt-Till's assailant. One of these was defendant.

Reed revealed to investigators that he had been involved in wholesale methamphetamine dealings with defendant. He owed defendant $500 at the time of the shooting. He had not slept in the apartment on the night of the murder. At the request of the police he made an inventory of his possessions; several items were missing, including stereo equipment, credit cards, jewelry, and a revolver. He had shown the revolver, which was kept in a closet, to defendant the previous year. Because it was unlawful for Reed, a former felon, to possess a handgun, he received immunity for this offense and for his drug dealing to induce him to cooperate with authorities.

Several details were filled in later by Victoria Huffman, who went to the police after her husband Charles beat her and slept with defendant's girlfriend. She stated that defendant had come to visit her husband on the night of the murder, that Charles and defendant planned to visit Reed because he owed defendant money, that they entered Reed's apartment and, finding no one there, took a number of items to satisfy the debt. On their return to the Huffman residence, Victoria asserted, she was sent to buy beer and bullets, the latter intended for the stolen revolver. The two men went to a remote area to test the gun; afterwards they reentered Reed's apartment, and it was then that Schmidt-Till was shot.

Defendant was charged with murder (Pen. Code, § 187), and as a special circumstance it was alleged that the killing occurred during the commission of a first degree burglary (*id.*, § 190.2, subd. (a)(17)(vii)). The People further accused defendant of two counts of burglary (*id.*, § 459) and alleged that he had been convicted of three prior felonies.

Defendant and Charles Huffman were tried in separate proceedings. At defendant's trial the People introduced evidence of footprints found outside the window through which the apartment had been entered. Some matched the boots defendant was wearing when arrested, but others were linked to Huffman. Bullets found at the scene were consistent with the victim having been shot three times, and they were similar in type to those bought by Victoria on the night of the killing. Some of Reed's possessions were located by police in a residence to which Huffman had access. The defense presented evidence and argument in an attempt to show that Huffman was the killer and that the prosecution had not proved that defendant participated in the crimes charged.

The jury returned a verdict of guilty of both the murder and the two first degree burglaries. It further found that the special circumstance was true,

that defendant personally killed the victim, and that the murder was committed with premeditation and deliberation. At the penalty phase the jury fixed the punishment at death, and the court sentenced defendant accordingly.

## I. *Guilt Phase Issues*

### A. *Hearsay Statements by the Victim*

The court admitted into evidence the statements that Schmidt-Till made to Officer Strigotte at the scene of the crime and a tape recording of statements Schmidt-Till made by telephone to the police dispatcher. These are, of course, hearsay, and may not be admitted into evidence unless they come under one of the exceptions to the rule. (Evid. Code, § 1200.) The court found the statements admissible both as spontaneous utterances and as dying declarations. Defendant attacks this ruling.

### 1. *The Spontaneous Statement Exception*

To come within the spontaneous statement exception to the hearsay rule, an utterance must first purport to describe or explain an act or condition perceived by the declarant. (Evid. Code, § 1240, subd. (a).) Secondly, the statement must be made spontaneously, while the declarant is under the stress of excitement caused by the perception. (*Id.*, subd. (b).) Defendant disputes that the utterances were spontaneous.[1]

When the dispatcher called Schmidt-Till, the following dialogue, played back at the trial, ensued:

"Schmidt-Till: Hello.

"Dispatcher: Erich?

"Schmidt-Till: Yeah.

"Dispatcher: This is the police department.

"Schmidt-Till: Uh-huh. (Affirmative.)

---

[1] The statute speaks of excitement caused by the perception of an event. A literal reading of this language conceivably might limit spontaneous declarations to psychic stress caused by *observing* an event, excluding the physical stress or pain experienced by participants. This is plainly not what was meant; spontaneous statements have traditionally included both types of excitement.

"Dispatcher: Have you been shot?

"Schmidt-Till: Three times.

"Dispatcher: Who shot you?

"Schmidt-Till: I'm not sure. I'm hurting.

"Dispatcher: Okay. There's an officer and an ambulance on the way. What did the guy look like?

"Schmidt-Till: I'll tell you when you get here.

". . . . . . . . . . . . . . . . . . . .

"Dispatcher: No. You tell me now so we know who we're looking for.

"Schmidt-Till: I can't talk. I've been shot in the mouth.

"Dispatcher: Erich, where were you shot?

"Schmidt-Till: In the mouth and in the stomach.

". . . . . . . . . . . . . . . . . . . .

"Dispatcher: Was it a white male or a black male?

"Schmidt-Till: White.

"Dispatcher: A white male? How—

"Schmidt-Till: I know his name.

"Dispatcher: You know him?

"Schmidt-Till: I just can't remember his name.

". . . . . . . . . . . . . . . . . . . .

"Dispatcher: How old is he?

"Schmidt-Till: About 35.

". . . . . . . . . . . . . . . . . . . .

"Dispatcher: Was it a handgun?

"Schmidt-Till: Yes. (Groaning.)"

Also admitted into evidence was the subsequent conversation between Officer Strigotte and Schmidt-Till. Strigotte testified that he found the victim bleeding but conscious and talking on the telephone. He questioned Schmidt-Till regarding the incident, but from moment to moment had to halt the questioning because of the victim's obvious pain. Schmidt-Till reiterated that he knew his assailant but could not remember his name. In response to specific questions, he described the man's race, weight, height, and age. Strigotte also asked about the assailant's clothing, hair color, tattoos, scars, and facial hair, but Schmidt-Till could not remember these features. He did say that Reed was his roommate but was not the one who shot him; the gunman, he asserted, was a customer of Reed. In addition, he gave an account of how the shooting occurred. Strigotte conjectured that the questioning lasted approximately five minutes. He elicited the information through a series of questions, each of which was answered separately.

In one sense, a "spontaneous" utterance is one that is voluntary and is initiated by, or at least not elicited from, the speaker. Under this literal interpretation of spontaneity, few of Schmidt-Till's statements would qualify. The dispatcher urged him to answer her questions, refusing to let him wait until help arrived. While his answers to Strigotte were more voluntary, none of the information was given on his own initiative, but likewise was elicited by specific questions.

But "spontaneous" may also be used in a slightly different sense: to describe actions undertaken without deliberation or reflection. This is what is intended by Evidence Code section 1240, which codifies the earlier common law exception to the hearsay rule (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]). As this court stated in *Showalter* v. *Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895], the basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief.

The crucial element in determining whether a declaration is sufficently reliable to be admissible under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be

important, but solely as an indicator of the mental state of the declarant. The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity. Thus, an answer to a simple inquiry has been held to be spontaneous. (See, e.g., *People* v. *Washington, supra,* 71 Cal.2d at pp. 1176-1177; *In re Damon H.* (1985) 165 Cal.App.3d 471, 475 [211 Cal.Rptr. 623]; *People* v. *Bernalley* (1960) 185 Cal.App.2d 326, 329-330 [8 Cal.Rptr. 375].) More detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity. (See, e.g., *People* v. *Keelin* (1955) 136 Cal.App.2d 860, 866-870 [289 P.2d 520, 56 A.L.R.2d 355]; cf. *Dolberg* v. *Pacific Electric Ry. Co.* (1954) 126 Cal.App.2d 487, 488-490 [272 P.2d 527].) But ultimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter. (*Showalter* v. *Western Pacific R.R. Co., supra,* 16 Cal.2d at pp. 468-469.)

■■■ On the record before us we conclude that the court did not err in admitting both conversations. It is true that we have rarely held the answers to such extensive questioning to be spontaneous utterances. (But see also *People* v. *Poggi* (1988) 45 Cal.3d 306, 317-320 [246 Cal.Rptr. 886, 753 P.2d 1082].) Nonetheless, there is no doubt that Schmidt-Till was excited, or perhaps more accurately, distraught and in severe pain. He was not merely an uninjured witness whose excitement might wane—and would thus be in a position to fabricate answers—through the sobering interrogation of an investigator. His responses were not self-serving. (Cf. *People* v. *Keelin, supra,* 136 Cal.App.2d at pp. 870-871.) Nor were the questions suggestive. (Cf. *Wiley* v. *Easter* (1962) 203 Cal.App.2d 845, 855 [21 Cal.Rptr. 905].) While he was being questioned, the intense pain of his gunshot wounds and the concern he rightfully had about his survival no doubt preoccupied him so that he could not have contemplated spinning a false tale. In sum, he had so little opportunity and incentive to deliberate that under these unusual circumstances we can dispense with the testimonial requirements of an oath and cross-examination. (Accord, *People* v. *Poggi, supra,* 45 Cal.3d at pp. 319-320.)

The mental state of the declarant, however, is but one of the two elements required for a spontaneous utterance. In addition, the statement must purport to "narrate, describe, or explain an act, condition, or event perceived by the declarant . . . ." (Evid. Code, § 1240, subd. (a).) ■■■ Defendant contends that Schmidt-Till's statements that his assailant was acquainted with his roommate Reed, that defendant had purchased drugs from Reed, and that defendant's name was on the telephone list did not "narrate, describe, or explain" the shooting. We disagree. Although not independently admissible under this exception for their truth, these statements help

describe the event by identifying the perpetrator. The claim that the assailant was one of Reed's customers not only helped identify him, but also aided in explaining the event as potentially drug-related.

Defendant also stresses the requirement that the declarant must have perceived what he describes or explains. This, he suggests, rules out Schmidt-Till's comment that he believed his assailant entered the apartment to steal his roommate's drugs. But the statements regarding drug dealing, while they do not describe the attack, do help to explain an event perceived by the declarant and are, therefore, admissible.

Since we hold that the admission of Schmidt-Till's statements as spontaneous utterances was not error, we need not decide whether they were also admissible as dying declarations.

## 2. Spontaneous Utterances and the Confrontation Clause

██ Even if Schmidt-Till's statements come within an exception to the hearsay rule, defendant argues that their admission violates his right to confront a witness against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)

The confrontation clause is not just a codification of the rules of hearsay and their exceptions as they existed historically at common law. (*California v. Green* (1970) 399 U.S. 149, 155-156 [26 L.Ed.2d 489, 495-496, 90 S.Ct. 1930].) ██ Rather, the United States Supreme Court has identified two factors for determining whether a hearsay exception violates the confrontation clause. First, the state must produce, or demonstrate the unavailability of, the declarant. That requirement is easily met here. Second, if the declarant is not available, the statement must bear sufficient "indicia of reliability." (*Ohio v. Roberts* (1980) 448 U.S. 56, 65-66 [65 L.Ed.2d 597, 608, 100 S.Ct. 2531].)

██ In our assessment of whether indicia of reliability underlie a specific hearsay exception, we essentially determine whether the historical reasons for believing that a particular type of statement is inherently reliable have withstood the test of time. The spontaneous utterance exception, in general, meets this test. Where the declarant is truly excited and makes a statement about a concurrently or recently perceived event before having the opportunity to think through the possible consequences of his utterance, it is likely to be a reliable statement. Several cases have held that admission of spontaneous utterances does not violate the confrontation clause. (See, e.g., *People v. Jones* (1984) 155 Cal.App.3d 653, 664 [202 Cal.Rptr. 289]; *People v. Orduno* (1978) 80 Cal.App.3d 738, 748 [145 Cal.Rptr. 806];

*McLaughlin* v. *Vinzant* (1st Cir. 1975) 522 F.2d 448, 450-451; *Shaffer* v. *Field* (9th Cir. 1973) 484 F.2d 1196, 1197.)

Defendant does not dispute that spontaneous statements, as a general proposition, are reliable. Rather, he asserts that the statements made in this case lack the requisite indicia of reliability. We conclude otherwise. When Schmidt-Till responded to the dispatcher's and Officer Strigotte's questions, he was gravely wounded and in intense pain. It is improbable that he had either the capacity or the motivation to relate anything but the truth. As another court has stated: "The remark followed hard upon an event—a shooting—likely to produce the utmost in excitement and shock and to ensure the utterance's spontaneity and, presumably, its truthfulness." (*McLaughlin* v. *Vinzant, supra,* 522 F.2d at p. 450.)

3. *Error in Admitting the Tape Recording*

■■■ Defendant's final contention regarding Schmidt-Till's statements is that the court abused its discretion in admitting the tape recording of his telephone call to the dispatcher. He claims the recording was both irrelevant and highly inflammatory.

The exclusion of relevant but prejudicial evidence is governed by Evidence Code section 352, which provides in part that the court may in its discretion exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." ■■■ Failure of the court to weigh the probative value of challenged evidence against its prejudicial effect is an abuse of discretion. (*People* v. *Ford* (1964) 60 Cal.2d 772, 801 [388 P.2d 892].) The weighing must be made explicit in the record. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 526 [224 Cal.Rptr. 112, 714 P.2d 1251]; *People* v. *Montiel* (1985) 39 Cal.3d 910, 924-925 [218 Cal.Rptr. 572, 705 P.2d 1248]; *People* v. *Green* (1980) 27 Cal.3d 1, 24-25 [164 Cal.Rptr. 1, 609 P.2d 468].) Silence in the record does not allow the inference that the court understood and performed its duty; the court must affirmatively articulate the fact that it has weighed probative value against prejudice. (*People* v. *Green, supra,* at p. 25; *People* v. *Frank* (1985) 38 Cal.3d 711, 732 [214 Cal.Rptr. 801, 700 P.2d 415]; *People* v. *Leonard* (1983) 34 Cal.3d 183, 187-188 [193 Cal.Rptr. 171, 666 P.2d 28].)

■■■ In the case at bar, the few comments the court made do not show affirmatively that it had engaged in a weighing process: "I don't believe the tape is that emotional. You know, we get more emotional things presented to us through the media every day. It's a horrible thing, but I wouldn't in no way equate it to a photograph of a girl, for example, who has been brutal-

ized and raped and murdered. It's nothing like that." The court's analysis is sufficient as far as it goes, but fails to mention the other side of the balance: the probative value, which might be so slight that even a modestly prejudicial piece of evidence should be excluded. Because the court did not make explicit its weighing process, the admission of the tape recording was error.

██ To determine prejudice we must inquire whether the trial court would have reached a different result if it had weighed the relevant considerations and stated that fact on the record. ██ The recording surely had some prejudicial effect—the passions of the jury must have been aroused by it, creating a danger that the jurors' desire to see someone brought to justice for this crime might interfere with their duty to meticulously appraise the evidence.

The People make several arguments regarding the probative value of the tape recording. They suggest that the tape was useful in allowing the jury the "rare . . . benefit of hearing the last words of a murder victim." This is hardly probative of any relevant issue. They also point to its description of the assailant. But the information on the tape was minimal and cumulative; Officer Strigotte's recitation was far more useful and subsumed all relevant descriptions on the tape. To the extent this information was probative, it could as easily have been admitted in the form of a transcript, thus avoiding inflaming the passions of the jury by so vividly recreating the aftermath of the shooting. Absent a good reason there was no need to "fill the courtroom with [the victim's] groans." (*People* v. *Love* (1960) 53 Cal.2d 843, 857 [3 Cal.Rptr. 665, 350 P.2d 705].)

The People also contend, however, that the tape was probative because it allowed the jury to determine that Schmidt-Till was relatively lucid despite his injuries. This was a crucial issue in the case, and listening to Schmidt-Till's voice on the tape is persuasive evidence that while he was frightened and in intense pain, his mental faculties had not yet been seriously impaired by his wounds. The jury was entitled to hear his confident tone when he described his assailant and declared that he knew the man even though he could not remember his name. The probative value of the recording in this respect outweighed any prejudice to defendant, and the court's failure to make its balancing of these factors explicit was thus harmless.

B. *Exclusion of Officer Strigotte's Opinion Testimony That Huffman More Closely Fit the Description of the Assailant*

██ At the preliminary examination defense counsel asked Officer Strigotte to choose whether defendant or Charles Huffman more closely matched Schmidt-Till's description of his assailant. Strigotte selected

Huffman. When counsel asked the same question at trial, the People objected; the court sustained the objection on the ground that it was "pure speculation and opinion." Defendant contends that excluding this evidence was an abuse of discretion.

Defendant draws our attention to Evidence Code section 800, which provides that opinion testimony by a lay witness "is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." Strigotte's information on the description of the killer could not, defendant asserts, be reduced to factual testimony. He contends that by the time of the trial, Strigotte had presumably forgotten some of the details of Schmidt-Till's description of his assailant. Thus his identification at the preliminary examination—a month and a half after the homicide—was helpful to a clear understanding of his testimony at trial.

Even if we assume arguendo that it would have been proper to admit Strigotte's opinion testimony on this point, defendant must still show that the court abused its discretion in excluding it. He attempts this showing by stressing that his primary defense is that Huffman killed Schmidt-Till. Strigotte's testimony supports this theory and, he argues, should have been admitted in order to allow defendant to properly defend himself.

The weak link in this chain of reasoning is the assertion that Strigotte's opinion was of special value to the jury. As the court correctly observed, Strigotte's selection of Huffman, based purely on the information he had received from Schmidt-Till, was speculation. Schmidt-Till's physical description of his assailant was so general that countless men in the Riverside area would have matched it. Strigotte was therefore in no unique position to testify that Huffman fit the general description. Beyond this, his choice at the preliminary hearing was based on only some of the information Schmidt-Till provided and might thus have misled the jury. A valid identification would have to take into account the victim's comments that he knew his killer, that he had business dealings with his roommate and had been to the apartment, and most importantly, that his name was in the "phone book." Thus, excluding Strigotte's opinion on this point was not an abuse of discretion.

## C. Curtailment of Cross-examination of Victoria Huffman

Defendant's next contention concerns a meeting at a restaurant between his girlfriend Dorothy Hicks, Huffman, and Huffman's wife Victoria.

During cross-examination of Victoria, defense counsel began to question her about this meeting. Stating this was the first he had heard of any such meeting, the prosecutor asked for a conference in chambers. There, counsel expressed his belief that Victoria, if she testified truthfully, would declare Huffman stated he was the killer; counsel took the position that this statement, although hearsay, would be admissible as a declaration against penal interest under Evidence Code section 1230.[2] Claiming this line of questioning would be unduly prejudicial unless counsel could first show Victoria would indeed testify to an admission by Huffman, the prosecutor requested a hearing on the matter outside the presence of the jury pursuant to Evidence Code section 402. Counsel objected, "[I]f she denies that her husband said those things I want her to deny that in front of the jury because I believe I have proof that she did say those things and I think that's important." The court overruled the objection.

At the hearing Victoria denied that Huffman admitted he was the killer. Defense counsel did not request permission to use her denial before the jury as a basis for impeachment, nor did he make an offer of proof of the evidence he proposed to introduce for impeachment. The court then barred counsel from continuing his line of questioning in front of the jury.

Defendant claims that the ruling was error. He argues that it improperly limited confrontation and cross-examination by depriving him of the opportunity to impeach Victoria's expected denial of Huffman's admission. We are not persuaded. The court's ruling was based, at least in part, on an implied determination that the proposed line of questioning was unduly prejudicial, i.e., that it would result in substantially more harm to the prosecution than benefit to the defense. Looking to the record before the court at that time, we cannot conclude that this determination was without adequate support: as stated above, defense counsel made no offer of proof of the evidence he proposed to introduce for impeachment.

Defendant now asserts that counsel would have presented the following evidence: Hicks would have testified that at the restaurant meeting Huffman did in fact admit he was the killer; she would also have testified that Victoria said to her, upon finding her *in flagrante delicto* with Huffman, "How can you sleep with my husband when he's the one responsible for your fiance being in jail. Stay away from him, how could such a thing happen." Defendant's "offer of proof," however, comes too late. Therefore, it cannot undermine the determination made by the court at trial.

---

[2] Section 1230 requires that the declarant be unavailable as a witness. Defendant contends the People waived any objection to this requirement by not demanding that defendant show Huffman to be unavailable.

Accordingly, we reject the claim that the court's ruling was error.

D. *Impeachment of Proffered Hearsay Testimony*

 Defendant desired to present testimony by Hicks, who later became his wife, that Huffman had admitted to her—i.e., in a declaration against penal interest—that it was he who shot Schmidt-Till. The prosecutor responded that he would then submit a tape recording in which Huffman pointed the finger at defendant. The court stated that it would allow such impeachment, whereupon defendant abandoned introduction of the Hicks statement.

Defendant first avers that the ruling prevented him from presenting a defense. Yet he remained free to introduce the Hicks statement. He is not entitled to have his hearsay evidence insulated from attack by contrary hearsay evidence.

Secondly, he urges us to hold that the ruling misinterpreted the Evidence Code. Section 1202 allows a hearsay declarant to be impeached by inconsistent statements even when the declarant is not given an opportunity to explain or deny the inconsistency. Defendant points to the comment to section 1202 by the Law Revision Commission, to the effect that if the declarant is available the party using his hearsay statement has the burden of calling him to explain or deny any alleged inconsistencies. But this does not require, as he claims, that before introducing the Huffman tape the People were obligated to call Huffman as a witness. It simply means that had the tape been introduced into evidence, Huffman should have been afforded an opportunity to explain the inconsistency. Since the tape was never placed in evidence, defendant's argument misses the point.

E. *Expert Testimony on Shoe Impressions*

1. *Preservation of the Evidence*

Investigators at the scene of the murder took several photographs of the ground outside the window that had been forced open. At trial, Department of Justice criminalist Faye Springer testified on the similarity between some of the footprints visible in the photographs and the imprint left by the shoes defendant was wearing at his arrest. Defendant sought to suppress this testimony both before and during the trial; neither motion was granted.

Springer identified a number of the footprints as matching those of defendant. In other photographs, her identification was less definitive. She further testified that impressions on the periphery of several of the photo-

graphs were probably made by Huffman's shoes. Referring to the quality of the photography, she admitted that Huffman's prints had been treated as secondary in all the photographs. Located toward the edges of the photographs, his prints were less in focus and sometimes inadequately illuminated, making identification difficult. Springer stated that if she had been at the scene, she would have taken more pictures of each print and, in order to plot the entire scene, more overviews.

 Defendant claims that the prosecution failed to adequately preserve the footprint evidence. With better photographs of the footprints, he contends, it would have been possible to determine if Huffman's impressions were made after those of defendant, thereby exculpating defendant.

In *People* v. *Hitch* (1974) 12 Cal.3d 641, 649-650 [117 Cal.Rptr. 9, 527 P.2d 361], we held that due process required the People to preserve breathalyzer ampoules for later retesting by defendants charged with driving while intoxicated. This duty to preserve evidence applies whenever there is a reasonable probability that it might constitute favorable evidence on the issue of guilt or innocence. *Hitch* was later extended to require the preservation of a semen sample taken from a rape victim (*People* v. *Nation* (1980) 26 Cal.3d 169, 177 [161 Cal.Rptr. 299, 604 P.2d 1051]) and a urine sample of a suspected narcotics user (*People* v. *Moore* (1983) 34 Cal.3d 215, 221-222 [193 Cal.Rptr. 404, 666 P.2d 419]). For purposes of discussion, we shall assume that *Hitch* remains fully vital after the decision of the United States Supreme Court in *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2520]. (See generally *People* v. *Griffin* (1988) 46 Cal.3d 1011, 1020-1022 [251 Cal.Rptr. 643, 761 P.2d 103]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 774, fn. 18 [251 Cal.Rptr. 83, 759 P.2d 1260].)

Defendant does not dispute the identification of his footprints, but rather argues that the police should have taken more and better photographs. He believes this would have shown that Huffman was the last entrant into the apartment. His contention must fail, however, because due process does not require that the prosecution obtain any particular evidence or conduct specific tests. (*People* v. *Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93].) The police cannot be expected to " 'gather up everything which might eventually prove useful to the defense.' " (*Ibid.*) Here, the police made a photographic record of the most prominent impressions outside the presumed point of entry, and the photographs are of reasonable quality. Defendant does not assert that this photographic evidence was not properly preserved, or that he was denied an opportunity to conduct his own analysis of it. Due process demands no more.

## 2. *Admission of Expert Testimony*

 In his motion to suppress the footprint evidence, defendant also objected to any expert testimony by Springer, who would later identify the impressions as having been made by defendant's boots. He asserts that the probative value of her testimony was outweighed by its prejudicial effect and that the court abused its discretion by admitting it. (Evid. Code, § 352.) We conclude otherwise. Surely the probative value of the identity of footprints outside the point of entry into the apartment is substantial. And the prejudice is nonexistent. Defendant argues that the evidence makes his conviction more likely, but that is manifestly not the sense in which section 352 uses the word "prejudice." Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. (See generally *People* v. *Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659 [758 P.2d 1189].) Such prejudging did not occur here.

Because the court ruled Springer's testimony admissible without making an explicit weighing of its probative value against its prejudicial effect, defendant alleges the ruling was error. We disagree. In his motion to suppress defendant attempted to undermine the reliability of Springer's proffered testimony, but did not argue that its prejudicial effect outweighed its probative value. Defendant's sole reference to section 352 in relation to this testimony appears only incidentally at the top of his notice of motions to suppress evidence, followed by several items of evidence to which he objects. Such a reference, however, was insufficient to trigger the duty defendant claims the court violated.

## 3. *Kelly-Frye Objection*

 The final issue regarding Springer's footprint testimony and the photographic evidence is that they do not meet the minimal requirements of the *Kelly-Frye* test. (*Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145]; *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].) Defendant urges us to hold that the evidence of the footprints and the analysis based on it fail to meet the requirements of the *Kelly-Frye* test because the investigation—especially the photographing of the impressions—was carried out in a defective manner.

Defendant relies for this conclusion on testimony by Springer and another prosecution witness that the footprint evidence was not collected in a scientifically acceptable manner. He mischaracterizes their statements. Although Springer felt that better photographs could have been taken of the prints, she also testified that her identification of at least one impression as made by defendant's boot was conclusive. This hardly renders the

identification unreliable. Furthermore, the *Kelly-Frye* rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. (See, e.g., *People* v. *Coleman, supra,* 46 Cal.3d at p. 775.) Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony. Finally, defendant does not show that he raised a *Kelly-Frye* objection at trial. For all these reasons the contention must fail.

## F. *Instructions Regarding Circumstantial Evidence*

Because much of the evidence was circumstantial, the court gave the general instructions distinguishing and defining direct and circumstantial evidence (CALJIC No. 2.00) and advising the jury that (1) a finding of guilt cannot be based on circumstantial evidence unless that evidence is consistent with guilt and cannot be reconciled with any other rational conclusion, (2) each fact supporting the inference of guilt must be proved beyond a reasonable doubt, and (3) if the circumstantial evidence is susceptible of one interpretation pointing to guilt and another pointing to innocence, the jury must adopt the latter (CALJIC No. 2.01).[3]

Defendant requested two special instructions, denominated D-1 and D-2, which purported to apply these rules to the evidence of the footprints outside the apartment window. D-1 would have told the jury that the footprint evidence was circumstantial, that the facts supporting an inference that defendant was the last person to enter the window had to be proved beyond a reasonable doubt, and that if the evidence could reasonably be interpreted as consistent with defendant having made the footprints either at the time of the murder or at the earlier entry, the jury should adopt the interpretation consistent with his innocence. D-2 was similar but less explicit. Additionally, defendant requested D-4, an instruction purporting to apply the foregoing rules of circumstantial evidence to Schmidt-Till's statements. It provided that the jury could infer the victim was referring to defendant only if it found beyond a reasonable doubt that Schmidt-Till had the ability to perceive his assailant, to accurately recall his appearance, and to reconstruct the circumstances of the assault.

The court declined to give defendant's special instructions, on the grounds that the general instructions on circumstantial evidence were sufficient and that giving the additional charges would confuse the jury. Defendant complains of this ruling, but it is correct. To the extent that the requested instructions stated principles of law, they were repetitious of instructions already given and hence were properly refused on that ground.

---

[3] All CALJIC citations herein are to the fourth edition (1979).

(*People* v. *Wright* (1988) 45 Cal.3d 1126, 1134 [248 Cal.Rptr. 600, 755 P.2d 1049].) To the extent that they purported to relate those principles to the facts of the case, they were properly refused as argumentative, i.e., they "would invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact, and therefore properly belong[ed] not in instructions, but in the arguments of counsel to the jury." (*Id.* at p. 1135.)

## G. *Felony-murder Instructions*

### 1. *Instructions on First Degree Murder*

▇▇▇▇ The court instructed the jury on the elements of burglary and felony murder.[4] Defendant maintains that the instructions were inconsistent and confused the jury. On the burglary charge, the jury was told that to convict defendant of that offense it had to find that he entered a dwelling with intent either to steal or to murder, these being the only felonies shown by the evidence. As to felony murder, however, the jury was instructed that it should find defendant guilty of murder in the first degree on that theory if it concluded he killed the victim during the commission of a burglary, but that the rule did *not* apply if defendant entered with the intent to commit murder. (*People* v. *Ireland* (1969) 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450

---

[4] The instruction was a modified version of CALJIC No. 14.50. It stated that the theories regarding defendant's purpose in entering the dwelling were that he intended to steal or that he intended to murder and that either would support a burglary conviction.

The court instructed the jury on homicide as follows: "The word 'homicide' means the killing of one human being by another, either lawfully or unlawfully. As used in these instructions, the word 'homicide' includes murder and manslaughter, which are unlawful, and the acts of excusable and justifiable homicides [*sic*], which are lawful.

"Defendant is charged in Count I of the Information with the commission of the crime of murder, a violation of Section 187 of the Penal Code.

"If a human being is killed by any one of several persons engaged in the perpetration of the crime of burglary, all persons who either directly and actively committed the act constituting such burglary or who with knowledge of the unlawful purpose of the perpetrator of the burglary intentionally aid, promote, encourage or instigate its commission by act or advice are guilty of murder in the first degree, whether the killing is intentional, unintentional or accidental.

"The specific intent to commit the crime of burglary and the commission of the crime of burglary must be proved beyond a reasonable doubt.

"This rule of law is known as the felony-murder rule. However, there is an exception to that rule. If you find that the crime of burglary in this case involves entry into a building with the specific intent to commit murder, then, in spite of the burglary, the felony-murder rule does not apply.

"In such a case, you are to base your verdict on the general rules regarding the definition of first and second degree murder and the general principles of liability for one who aids and abets another in the commission of a crime. These general principles are given in these instructions. As with all instructions, how they apply to the facts of this case are matters for your consideration."

P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Wilson* (1969) 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22]; *People* v. *Sears* (1970) 2 Cal.3d 180, 187-188 [84 Cal.Rptr. 711, 465 P.2d 847].)

It is possible the jurors were somewhat confused by the juxtaposition of these instructions: the jury sent the court a note asking for a rereading of the instructions on first degree murder and first degree burglary. But defendant would not have avoided a first degree murder conviction even if the instructions had been models of clarity: the jury also made a specific finding, beyond a reasonable doubt, that the murder was committed with premeditation and deliberation. This finding will support a first degree murder conviction no less than does the felony-murder rule. (Pen. Code, § 189.) It follows that any possible confusion in the instructions on first degree felony murder was harmless.

2. *Instructions on the Special Circumstance*

▮▮▮ Another difficulty appears in the relationship of the doctrine of *People* v. *Ireland, supra,* 70 Cal.2d 522, to the special circumstance instructions. The only special circumstance alleged in this case was that the murder took place during the commission of a burglary. (Pen. Code, § 190.2, subd. (a)(17)(vii).) As the court pointed out in its instructions on the felony-murder rule, defendant might have entered the apartment the second time either to engage in further theft or to murder Reed. On the guilt issue, the court correctly instructed the jury on the *Ireland* exception—i.e., that the felony-murder rule could apply only if the jury found the second entry was for the independent purpose of theft and not for the purpose of murder. On the special circumstance issue, however, the court did not specifically instruct on that exception. But it did instruct the jury, pursuant to *People* v. *Green, supra,* 27 Cal.3d at pages 61 to 62 (decided under the relevantly similar 1977 death penalty law), that it could not find the special circumstance true unless it first found that the burglary was committed in order to advance an independent felonious purpose—i.e., that the special circumstance would not be established if the burglary was merely incidental to the murder.

We shall assume for argument's sake that the doctrine of *Ireland* is applicable to the felony-murder special circumstance. From that assumption it follows that the court was obligated to instruct the jury that it was required to find that the second entry was not for the purpose of murder but for the independent purpose of theft. But as noted above, the court effectively told the jury to make such a finding by instructing it on independent felonious purpose pursuant to *Green.* Accordingly, the court cannot be deemed to have erred under *Ireland.*

## H. *Incompetence of Trial Counsel*

■ Defendant maintains that the incompetence of his counsel prevented him from exercising his right to call witnesses in his defense. At the beginning of the trial, his counsel twice went to interview Charles Huffman, who was imprisoned on a burglary charge arising out of the present events. On both occasions Huffman allegedly confessed to shooting Schmidt-Till. Huffman was not called to testify until the penalty phase, when he asserted his privilege against compelled self-incrimination. At that time the potential conflict between counsel's role as a witness and as an advocate (see *Comden v. Superior Court* (1978) 20 Cal.3d 906, 912 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562]) became evident to the parties and to the court. At the penalty phase, counsel testified to Huffman's statements.

Suggesting that his counsel should have known it would become necessary for him to be a witness, defendant claims counsel was obligated to withdraw during the guilt phase so that he could testify for the defense. The argument is that once counsel withdrew he could have told the jury of the admissions or, if Huffman took the stand and implicated defendant, could have impeached Huffman's testimony.

Rule 2-111(A)(4) of the Rules of Professional Conduct provides in pertinent part that a member of the State Bar who knows or should know that he ought to be called as a witness on behalf of his client in litigation concerning the subject matter of the employment may continue to represent the client only if he obtains informed consent. Because, defendant alleges, his counsel failed to adhere to this rule, he was denied the right to call a witness—his own attorney—in his defense.

On this record, however, we cannot find incompetence. As we explained in *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732 [590 P.2d 859, 2 A.L.R.4th 1]: "In some cases . . . the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." This is such a case: the appellate record sheds no light on why trial counsel acted as he did; he was not asked to explain his performance; and we are unable to conclude that a satisfactory explanation could not have been provided. Thus, we must reject defendant's point.

## I. *Denial of Defendant's Motion for a New Trial*

■ Defendant moved for a new trial on two grounds. First, he alleged the statements by Huffman to his (defendant's) attorney were newly

discovered evidence. The second ground, added by substituted defense counsel, was the asserted ineffective assistance of the former counsel. The court denied the motion.

Penal Code section 1181, subdivision 8, provides that a court may grant a new trial when new evidence is discovered that is material to the defendant's case and that he could not with reasonable diligence have discovered and produced at trial. ■■■ Several factors must be considered by the court: the evidence itself, not merely its materiality, must be newly discovered; the new evidence may not be cumulative; and it must render a different outcome probable. The ruling will not be disturbed absent an abuse of discretion. (*People* v. *Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203].)

■■■ Here, Huffman's statements were not "newly discovered," because at least defendant's counsel, to whom the alleged confessions were made, knew of them from the outset. The record is unclear whether defendant also knew of them. Even if we were to determine that the statements qualified as newly discovered, Huffman was an unreliable witness whose testimony, although offered through the mouth of defendant's attorney, would have been impeached by Huffman's statement to the police inculpating defendant. Thus testimony by Huffman or by defense counsel regarding Huffman's earlier statements would probably not have led to an outcome more favorable to defendant. Indeed, as noted above counsel did testify regarding Huffman's admissions at the penalty phase, but the jury returned a verdict of death nonetheless.

The alternate ground for a new trial was that defendant was inadequately assisted by his first trial counsel (see *People* v. *Fosselman* (1983) 33 Cal.3d 572, 582-583 [189 Cal.Rptr. 855, 659 P.2d 1144]), who by failing to withdraw and testify regarding Huffman's statements allegedly deprived defendant of a potentially meritorious defense. But we have already concluded that on this record counsel cannot be deemed incompetent in declining to call Huffman—or to testify himself regarding Huffman's statements—during the guilt phase. And we have concluded that admission of Huffman's contradictory statements would probably not have altered the result of the guilt determination.

## J. *Restrictions on Cross-examination*

Reed, the roommate of Schmidt-Till, testified that defendant fit the description that the latter gave the police of his assailant. Reed had received immunity for the sale of illegal drugs and for his possession, while a former felon, of a handgun. Although the court allowed defendant to question

Reed about his drug-related activities, it refused to let him attempt to impeach Reed by asking about any such activities occurring after the grant of immunity. ■■■ Defendant maintains that Reed would have a powerful motive to make his testimony favorable to the People if he had engaged in criminal activity subsequent to the period of his immunity, and that to deny the right to cross-examine on this issue deprived him of the right to confront a witness against him.

The problem with defendant's reasoning is that even if Reed was engaging in further criminal activity, he would not have had a motive to testify in accordance with the prosecutor's wishes unless there were actual or potential charges against him, since only then could the People offer him an inducement in return. Defendant does not argue that an agreement with the prosecutor was withheld from the jury. Presumably, the prosecutor acted honorably and would have informed the jury of any misleading statements by Reed in this respect. (See *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132].) And defendant was free to ask whether there were any other inducements to testify. Since it is not criminal activity per se that constitutes a motive to lie, but rather the prosecutor's power to reward favorable testimony by granting immunity or a lesser penalty for an existing charge or conviction, direct inquiries regarding the criminal activity of a witness are irrelevant and were properly excluded.

### K. *Instructions Regarding Unjoined Perpetrators of the Same Crime*

■■■ Defendant next objects to the giving of the following instruction on unjoined perpetrators of the same crime: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [¶] You must not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted." (CALJIC No. 2.11.5.) Defendant maintains the instruction undermined his efforts to defend himself by suggesting Huffman was the killer; the instruction had this effect, he urges, because it deflected the jury's attention away from Huffman's role.

As the People point out, the instruction does not tell the jury it cannot consider evidence that someone else *committed* the crime. (See generally *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99].) It merely says the jury is not to speculate on whether someone else might or might not be *prosecuted*. We agree that the instruction would be more informative and might better deter speculation if it told the jury explicitly that its sole duty is to decide whether *this* defendant is guilty and that there

are many reasons why someone who also appears to have been involved might not be a codefendant in this particular trial. (Cf. 1 Devitt & Blackmar, Federal Jury Practice and Instructions (3d ed. 1977) § 11.06.) Nonetheless, as far as it goes the instruction accurately states the law and does not appear to have been misleading.

Defendant argues that another consequence of the instruction was that the jurors, doubting whether someone else was being brought to justice for this crime, might have decided to convict defendant so that at least one person involved would be punished, even if they believed his role was marginal. But such a claim amounts to the untenable assertion that whenever a person implicated in a crime is brought to trial, the jury—desirous of punishing someone for the crime—will be inclined to convict the accused regardless of the actual extent of his involvement. In the absence of a clear showing to the contrary, we must believe the jury presumed this defendant innocent as it was instructed to do and convicted him of specific crimes on the basis of the evidence, not simply from an indiscriminate desire to punish.

## L. *Instructions Regarding Defendant's Preoffense Statement*

Defendant's next contention is that the court erred in instructing the jury as follows: "Evidence has been received from which you may find that an oral statement of intent or plan was made by the defendant before the offense with which he is charged was committed. [¶] It is your duty to decide whether such a statement was made by the defendant. [¶] Evidence of an oral statement ought to be viewed with caution." (CALJIC No. 2.71.7.) Defendant claims there was no testimony of any statements of intent or plan by him and hence the instruction should not have been given. (See *People* v. *Anderson* (1965) 63 Cal.2d 351, 360 [46 Cal.Rptr. 763, 406 P.2d 43].) There was evidence, however, of statements by defendant to Victoria Huffman before the murder that he and Charles Huffman were going to the apartment of someone who owed defendant money. These assertions, together with defendant's request that Victoria obtain bullets for the gun stolen during the first burglary, might, with certain inferences, be viewed as statements evidencing an intent or plan. In view of such substantial evidence, the instruction was proper.

## M. *Special Findings by the Jury*

In addition to reaching a verdict on the charged offenses, the jury was asked to make two special findings if it found defendant guilty: (1) that defendant personally killed the victim, and (2) that he did so with premedi-

tation and deliberation. The People submitted these proposed findings with the express goal of protecting the verdict on review.

A jury in a criminal trial must, except in enumerated circumstances, deliver a general verdict. (Pen. Code, § 1150.) But in a true special verdict the jury finds only the facts, leaving judgment to the court. (*Id.*, § 1152.) Here, the jury returned a general verdict of guilt and, on the assumption it followed instructions, decided the two specific questions afterwards. The findings were thus not a special verdict.

 Defendant suggests that although the questions do not violate the requirement of a general verdict, they are impermissible because they are not explicitly authorized by statute. In addition, since special findings are expressly allowed in civil trials (Code Civ. Proc., § 625), the fact that they are not authorized by statute in criminal proceedings further implies they are inappropriate. On these grounds, we held in *People* v. *Perry* (1972) 7 Cal.3d 756, 783-784 [103 Cal.Rptr. 161, 499 P.2d 129], that the defendant did not have the right to present the jury with special interrogatories. But *Perry* differs from the case at bar in several respects. There the disapproved question required that the jury make a written finding regarding the sufficiency of the evidence *before* it could consider the issue of guilt. This demand created a clear danger of interference with the jury's deliberative process, the very evil sought to be avoided by the rule against special criminal verdicts. Furthermore, although the questions here are not specifically authorized by statute, Penal Code section 190.4 does mandate that the trier of fact make special findings on the truth of alleged special circumstances. We held in *People* v. *Burgener, supra,* 41 Cal.3d at pages 537 to 538, that a special finding on whether the crime was committed with express malice aforethought as well as with deliberation and premeditation was a finding authorized by section 190.4. The special findings here were such.

Defendant also contends the special findings violated his right to trial by jury and due process. But having considered the matter closely, we can find no such violation here.

Finally, because the special findings were proposed toward the end of the guilt phase of the trial, defendant claims he lacked an opportunity to contest these issues. We find no merit in this point. The questions were the central focus of a proceeding that lasted several weeks. Defendant's claim is valid only in its most trivial sense—that he did not know these issues would be raised in the particular form of special questions. No error appears.

### N. *Evidence of Third Party Culpability*

Defendant's main theory at trial, aside from insufficiency of the evidence, was that Huffman was the killer. The court did not, however, allow him to present evidence of Huffman's history of violent crime, which defendant offered on the theory that it tended to identify Huffman as the perpetrator.

In *People* v. *Hall, supra,* 41 Cal.3d 826, we clarified the standard for admission of evidence that a third party is guilty of the charged offense. *Hall* requires that such third party evidence be capable of raising a reasonable doubt of the defendant's guilt and that there be direct or circumstantial evidence linking the third person to the actual perpetration of the crime. This evidence should not, as formerly, be judged according to an elevated standard of admissibility, but should rather be treated like any other evidence. (*Id.* at pp. 831-834.)

Defendant seeks to characterize his proposed evidence of Huffman's criminal activity as relating to motive and intent. Upon analysis, however, we find the evidence is essentially an attempt to show that Huffman is more likely to have been the killer because he has a history of violence. Because specific instances of past conduct were offered to prove Huffman's conduct on this occasion, the court properly excluded the information under Evidence Code section 1101.[5]

Defendant also maintains that to the extent the rules of evidence prevent him from disclosing Huffman's criminal activity to the jury, his constitutional rights to compulsory process, confrontation, presentation of a defense, and due process have been taken from him. We rejected essentially the same contention in *People* v. *Hall, supra,* at pages 834 to 835.

### O. *Refusal to Let the Defense Read From a Magazine Article*

The court declined to allow defendant's counsel, during his summation, to read from a Scientific American article by psychologist Elizabeth Loftus on eyewitness identification. Because the reliability of Schmidt-Till's identification of his assailant was probably the key issue in the case, he contends the alleged error compels reversal.

In appropriate circumstances it may be an abuse of discretion for the court to exclude expert testimony on the reliability of eyewitness

---

[5] Defendant also contests the exclusion of the same evidence in the penalty phase, asserting that he had a right to urge his possible innocence to the jury as a factor in mitigation. (*People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248].) He had that right, and his counsel so argued. But for the same reasons that it was inadmissible at the guilt phase, Huffman's criminal activity could not be put before the jury in the penalty phase.

identification. (*People* v. *McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) We begin by noting this is not such a case. The issue here is not the admissibility of potentially relevant testimony, but the use in summation of an article, not in evidence, published in a popular scientific magazine.[6]

Defendant claims that he had a right to read the article during final argument. The point must be rejected. Counsel's summation may be based on matters in evidence or subject to judicial notice. It may also refer to matters of common knowledge or illustrations drawn from experience, history, or literature. (*People* v. *Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33].) On this record we cannot determine whether summation incorporating the reading of the Loftus article would have been proper: defendant apparently did not inform the trial court of the contents of the article, nor did he provide us with a copy.[7]

## P. *Reading From the Prosecutor's Closing Argument in a Related Case*

In his closing argument, defendant desired to read to the jury two excerpts from the prosecutor's summation in the trial of Huffman, who had been tried separately prior to defendant. In one excerpt the prosecutor had argued that the evidence showed there were several footprints of Huffman outside the apartment window but only one set of defendant's prints, and that this fact suggested Huffman's guilt. The other excerpt showed the prosecutor arguing that Huffman's wife Victoria was not a reliable witness. In both instances he argued to the contrary in defendant's trial. The court ultimately rejected the request.

A prosecutor must perform his function with the highest degree of impartiality. In addition, the defense is typically given wide latitude in its closing argument. These two principles, defendant suggests, made it error to refuse to let him read the prosecutor's comments in the Huffman trial to the jury. We disagree. As noted above, it is improper to state facts that are not in evidence during summation, with certain narrow exceptions such as commonly known matters. (*People* v. *Love, supra,* 56 Cal.2d at p. 730.) What the prosecutor argued in another trial is not a proper subject for closing argument. This is true not only because it is not a fact in evidence, but also

---

[6] We note that the court did allow into evidence the testimony of Dr. Sbordone, a neuropsychologist who specialized in the effect of brain injuries on cognitive processes.

[7] The record suggests that the court might have refused to allow reading of the Loftus article simply because it was not in evidence. As we have seen, this is not the law: a court must review a proffered article to determine whether its contents are within the scope of proper summation. But as noted above, the article was apparently not presented to the court.

because the jury is unaware of the context of the quoted argument and may thus be misled.

Furthermore, counsel have a right to present to the jury their views on the deductions or inferences that the facts warrant. Their reasoning may be faulty, but this is a matter for the jury to decide. (*People* v. *Willard* (1907) 150 Cal. 543, 552 [89 P. 124].) Even if the prosecutor had argued in the Huffman case that the evidence pointed to Huffman's guilt and in the present case that it suggested defendant was guilty, his argument would not be improper as long as it was based on the record and made in good faith. Defendant would have a valid complaint only if he could show that the argument in his case was not justified by the evidence or was made in bad faith. Although such a showing might support a claim of prosecutorial misconduct, it would not justify reading to the jury allegedly inconsistent argument from another, albeit related, trial.

 A second basis on which defendant asserts error is that while considering the motion the court had lunch with another judge and solicited his views on the propriety of allowing the argument. We have held that a judge may generally not consult experts outside of court. (*People* v. *Archerd* (1970) 3 Cal.3d 615, 638 [91 Cal.Rptr. 397, 477 P.2d 421].) A major reason for this rule is that the parties have no opportunity to cross-examine the expert. But that rule does not extend to a judge asking the opinion of one of his colleagues on an abstract principle of law. Another judge is not an "expert" in the sense that he might inject questionable facts or opinions into the case; the inability to cross-examine him therefore does not prejudice the parties. This conclusion is bolstered by the commentary to canon 3(A)(4) of the California Code of Judicial Conduct, which provides that although a judge should not initiate ex parte communications concerning a pending proceeding, the canon does not preclude him from consulting with other judges. Of course, the court must reach its own conclusions and shoulder full responsibility for them, but collegial interchanges on abstract legal matters are not improper.

## Q. *Death-qualified Jury*

 Defendant contends the excusal for cause of prospective jurors who would automatically vote against the death penalty deprived him of his due process right to a fair trial at the guilt phase and violated his Sixth Amendment right to a representative jury. The argument has previously been rejected by this court (e.g., *People* v. *Hamilton* (1988) 46 Cal.3d 123, 136 [249 Cal.Rptr. 320, 756 P.2d 1348]), and by the United States Supreme Court (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-183 [90 L.Ed.2d 137, 147-154, 106 S.Ct. 1758]).

R. *Insufficiency of the Evidence*

 Defendant's final assignment of error in the guilt phase is that there was insufficient evidence to support the verdict. In *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], we stated that on review the question is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt to the reviewing court. We must view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found defendant guilty beyond a reasonable doubt.

 We begin by noting the most important piece of evidence, which came from the mouth of the victim himself. Although there were few lights on in the apartment, the jury was entitled to believe that Schmidt-Till recognized his assailant, that the killer had engaged in drug transactions with his roommate Reed, and that his name was on Reed's phone list. We recognize that the evidence allows the question whether Huffman or defendant was the actual killer. Huffman's contradictory statements are of little help. It is true, as defendant repeatedly points out, that Schmidt-Till may have vaguely known Huffman, who was a maintenance man at the apartment complex for a few months before the killing and who may also have bought drugs from Reed. Yet this is largely speculation. We know that Schmidt-Till had met defendant, that defendant dealt in drugs with Reed, and that only defendant's name was on the telephone list. Furthermore, defendant was the person with the motive to steal from Reed because of his drug debt. In these circumstances a rational finder of fact could have found beyond a reasonable doubt that it was defendant who killed Schmidt-Till.

## II. *Penalty Phase Issues*

 Of the several issues defendant raises relating to the penalty phase, we need discuss only his contention that in closing argument the prosecutor misled the jurors as to their responsibility in the sentencing process. We find this contention meritorious under *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], and *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669].

In *Caldwell* the United States Supreme Court set aside a judgment of death because in closing argument the prosecutor told the jurors that the state supreme court would automatically review their decision that death was the appropriate penalty: "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the

defendant's death rests elsewhere." (472 U.S. at pp. 328-329 [86 L.Ed.2d at p. 239].) The high court reasoned that such misinformation "presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." (*Id*. at p. 333 [86 L.Ed.2d at p. 242].) And it concluded, "This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.' In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires. The sentence of death must therefore be vacated." (*Id*. at p. 341 [86 L.Ed.2d at p. 247].)

In *People* v. *Milner, supra,* 45 Cal.3d 227, we applied the *Caldwell* rule to a case in which the prosecutor did more than shift the jury's responsibility to another body—he virtually negated its existence. There the court instructed the jury on its sentencing responsibilities in terms of Penal Code section 190.3 (former CALJIC No. 8.84.2); that instruction, we reiterated, could have misled a juror into believing his duty was simply to "count the factors" and vote for death if aggravating factors outweighed mitigating, even if he personally believed death was not the appropriate penalty. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

The prosecutor's argument in *Milner* further—and affirmatively—misled the jurors. He told them that their sole duty under the law is to weigh aggravating against mitigating factors and to impose death if they find that aggravating factors predominate; and he repeatedly warned them that if they also consult their "personal feelings" or try to "do justice" in the particular case before them, "you're stepping outside of the protection of the law and taking upon your shoulders a weight that you, as jurors, are not required under the law to shoulder" (45 Cal.3d at p. 255).

We concluded (at p. 257) that "Here, as in *Caldwell,* 'the prosecutor's argument sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." ' [Citations.] Here, as in *Caldwell,* the prosecutor's argument, left uncorrected, so affected 'the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment.' "

On that record we unanimously held (at pp. 257-258 of 45 Cal.3d) that the jury was misled as to its discretion and responsibility in fixing the penalty, and hence that reversal was mandated by *Caldwell* and *Brown*.

In the case at bar the prosecutor made the following argument. The first major part comprised a review of the evidence. In this section he briefly referred to the evidence of the guilt phase and then surveyed the evidence of the penalty phase in greater detail.

The second major part of the argument was given to a preview of the instructions to be delivered by the court. In the course of his discussion the prosecutor commented on the so-called "no sympathy" instruction, CAL-JIC No. 1.00.

"The question of what penalty is appropriate in cases like this is by nature an emotional subject. But the law says you can't decide this on emotion. And the law is correct. . . .

"If this was another setting, another time, another place, if this was the 3rd of November and election day was the 4th of November and we were in a town hall meeting and we were all deciding whether or not to vote for a capital punishment law, then I suppose advocates from both sides could get up and talk to you about emotion. In fact, they should, because when you vote on such a thing it's not a cold act.

"In deciding whether or not this State of California should have had or should not have a capital punishment law, the subjects of love, of hate, of revenge, of retribution, of punishment, of religion, of deterrents [*sic*], the subject of value of human life, the subject of the meaning of human life, your basic personal morality, the heart of the things you live by are all very relevant and all play a great deal in that decision on whether or not to vote for the law that would permit the State to kill another human being if he does a murder.

"But this isn't that setting. That great debate is over. The voters have spoken with a clear voice. That law was passed. And the overwhelming majority of voters when they voted for it may have done so on grounds of emotion and may not, may have done so on grounds of moral outrage, which is passion. But we're not here. Now we're here to apply that law. And all those things are not to be considered as relevant as they may seem.

"We are now here to fairly and justly apply the law. And, quote, mere sentiment, conjecture, sympathy, passion, prejudice, et cetera, et cetera, have no place in fairly and justly applying the law.

"Now, one word I have conspicuously left out in all these things that have no place is the word 'mercy'. Mercy does play a role. I am not going to deny that. Because you are not here to, as robots, go through the law and mechanically just impose it.

"You are here to do it with justice. You're here to do it in a human fashion, and that includes mercy. Justice includes mercy. If and only if mercy is warranted. It's not warranted, then it should not be applied.

"This law which I'll be talking of probably after lunch has mercy in it, too. That's what mitigation and aggravation is all about. But other things we have to set them aside, as difficult as it will be."

After making the comments quoted above, the prosecutor proceeded in his preview of the court's instructions. He soon made some introductory remarks about the statutory factors to be considered in the determination of penalty. At that point, the court ordered a recess for lunch.

After lunch, the prosecutor continued his preview of the instructions with the following comments on the penalty-determining process. He said: "You are to consider and be guided by and take into account these catagories [*sic*] of either mitigation or aggravation, and then you shall weigh them. It is not a mechanical process or a mathematical process. You don't necessarily assign point scores to these things and just tally them up." He also said: "The law doesn't say simply count up the 11 and say, well, there is five on one side, six on the other, or eight on one side, three on the other. . . . [¶] The law doesn't tell you which of these 11 you should find should be the most weighty or the most important. That is something you have to determine with the help of your fellow jurors, something you will have to determine by use of your common sense. [¶] . . . You do have discretion. You have common sense, you have to apply it."

The prosecutor then previewed each of the statutory sentencing factors. And as to each he stated his opinion on whether it applied to this case and if so whether it weighed in favor of aggravation or mitigation.

The third major part of the prosecutor's argument was the conclusion. He stated: "There is nothing mitigating about this case. The law gives ample opportunity to find it, and it is not there.

"It says weigh. The law says weigh it.

"We have gone through all of them, and I won't bother to repeat it, but you notice there was no mitigation at all, with one possible exception,

presence of other violent acts. And that is on one side. No mitigation, at all. . . .

 ". . . . . . . . . . . . . . . . . . .

 "The aggravation is there. It is substantial. And the mitigation is non-existent or insubstantial.

 "I told you earlier that the law just doesn't say pick 12 people off the street, tell them the facts of the case, the[n] ask [them] should he live or should he die?

 "Whether or not Mr. Farmer should live or die was decided by the voters of this state when they passed this law, when they set the criteria. They decided who lives and who dies. You decide does aggravating outweigh mitigating? That is your job. That is all you decide. The law does the rest. It is not you. You are unfortunately picked here to do that which has to be done, decide whether or not aggravating outweighs mitigating. You do not decide life or death. The law does that."

 The prosecutor then closed by reminding the jurors of their oath and asking them to fulfil their obligations.

 Having considered the matter closely, we believe that the prosecutor misled the jurors as to their sentencing responsibility in violation of *Caldwell* and *Milner*. At the beginning of his argument, he appeared to concede that the jury could properly exercise "mercy" in fixing the penalty. At the end, however, he in effect nullified this advice. He informed the jury that by exercising "mercy" he meant only to refer to the process of weighing aggravating against mitigating factors: he told the jurors they can "show mercy" only if there is "true mitigation," which he proceeded to define as a case in which they find the mitigating factors to outweigh the aggravating. And he vigorously argued that this is not such a case.

 Next the prosecutor went to considerable lengths, as in *Milner*, to persuade the jurors that the responsibility for determining the appropriateness of putting this defendant to death rested not on each of them personally but on "the law." He did this in the case at bar by the device of drawing a distinction between the function of the electorate in voting on the 1978 death penalty initiative and the function of the jurors in deciding the proper penalty in this case.

 As noted above, early in his argument he told the jury, "If this was another setting, another time, another place, if this was the 3rd of Novem-

ber and election day was the 4th of November and we were in a town hall meeting and we were all deciding whether or not to vote for a capital punishment law, then I suppose advocates from both sides could get up and talk to you about emotion." In that debate, the prosecutor explained, such subjects as "the value of human life" and "your basic personal morality" were relevant and should have been considered by the voters. He continued: "But this isn't that setting. That great debate is over. The voters have spoken with a clear voice. That law was passed. And the overwhelming majority of voters when they voted for it may have done so on grounds of emotion and . . . of moral outrage, which is passion. But we're not here. Now we're here to apply that law. *And all those things are not to be considered, as relevant as they may seem.*"

With this last remark the prosecutor began to lead the jury astray: it is simply *not* true that such concerns as the value of human life and the personal morality of the jurors "are not to be considered" by a jury deciding whether the defendant should live or die.

The jury was totally derailed at the end of the argument, when the prosecutor returned to his proposed distinction and used it as his premise for a conclusion that was both legally erroneous and highly misleading. He said to the jury: "I told you earlier that the law just doesn't say pick 12 people off the street, tell them the facts of the case, the[n] ask [them] should he live or should he die? *Whether or not Mr. Farmer should live or die was decided by the voters of this state when they passed this law, when they set the criteria. They decided who lives and who dies. You decide, does aggravating outweigh mitigating. That is your job. That is all you decide. The law does the rest. It is not you.* You are unfortunately picked here to do that which has to be done, decide whether or not aggravating outweighs mitigating. *You do not decide life or death. The law does that.*" (Italics added.)

Every one of the prosecutor's emphasized statements was wrong. It is *not* true that the voters decided whether *this* defendant should live or die when they adopted the 1978 initiative. It is *not* true that the only responsibility of the penalty jury is to determine whether the aggravating factors outweigh the mitigating. And it is *not* true that the jurors "do not decide life or death" or that "The law does that" for them.

Yet this was the unmistakable message that the prosecutor left the jury with; immediately after making these assertions he reminded the jurors of their oath to follow the law, and sat down. In turn, defense counsel did not correct the prosecutor's highly misleading statements, but argued primarily that his client was innocent. And the court instructed only in terms of former CALJIC No. 8.84.2.

This is not a case in which a reviewing court can reasonably rely, as does the dissent, on the trial court's instructions and other aspects of the argument by counsel to support a conclusion that the jurors were left with a proper understanding of their sentencing role, and an appreciation that each was individually responsible for the life or death decision. Here, the prosecutor delivered his admonition that the law decided the penalty as he concluded his summation. It was quite clearly intended to be understood as summarizing the message he had been trying to convey throughout his argument. A conscientious juror who attempted to reconcile the instructions and argument in this case would have been misled if he so understood the prosecutor's words. The timing almost insured that the jurors would believe the message to be: "We must consider the mitigating evidence. We must weigh, and not count the factors; and we may show mercy in weighing the factors; and we must decide whether the aggravating factors outweigh the mitigating. But that is all we do. As the prosecutor explained, the law does the rest. We decide whether or not aggravation outweighs mitigation. We do not decide life or death. The law does that."

The dissent's characterization of the prosecutor's closing remarks downplays the impact of their declaratory nature. First, the prosecutor informed the jury that "the law" decided whether *this* defendant would live or die, and that it was not the jury's responsibility and obligation to decide the propriety of death as a penalty in this case. This is not mere argument that "the law is the law" and the jury could not second-guess it. (Conc. & dis. opn. of Panelli, J., *post,* at pp. 934-935.) The prosecutor was not simply reminding the jury that it had to accept the fact that we have a "death penalty law"; he told the jury that "the law," and *not the jury,* decided whether or not *this* defendant lived or died.

Nor can we accept the dissent's suggestion that the prosecutor's closing directions would be understood as being "made in the context of" his earlier distinction between voting for a death penalty statute and voting on the issue of death in the present case. (Conc. & dis. opn. of Panelli, J., *post,* at p. 934.) The former discussion occurred 17 transcript pages before the prosecutor's concluding, erroneous statements. In between, the prosecutor listed and described the sentencing factors, the court recessed for lunch, and argument resumed with further explanation by the prosecutor of the sentencing factors. Then—at the very end of his argument—the prosecutor delivered the constitutionally impermissible explanation of the jury's sentencing obligation. We believe that these remarks may have misled the jury and thereby diminished its sense of responsibility for the verdict it was to return.

The prosecutor's peroration did not simply inform the jury that it was obligated to accept the death penalty law; nor could it be understood as

implicitly relating back to that earlier point in the closing argument. Instead, the concluding message conveyed to the jurors was that they were bound to exercise discretion in weighing the aggravating and mitigating factors, but need not and should not, if they were to follow the law, exercise discretion in deciding whether defendant should live or die. Jurors hearing this argument, timed as it was, would be misled about their fundamental obligation: to decide whether "this defendant" "deserves" to die.

On this record the case is indistinguishable from *Milner*: as in that case, "In essence the jurors were told that the 'awesome responsibility' for the life and death determination did not rest with them." (45 Cal.3d at p. 257.) In these circumstances we must likewise conclude that the jury was misled as to its discretion and responsibility in fixing the appropriate penalty, and hence that the judgment of death must be set aside under *Caldwell, supra,* 472 U.S. 320, *Milner, supra,* 45 Cal.3d 227, and *Brown, supra,* 40 Cal.3d 512.

The judgment is reversed as to penalty, and is affirmed in all other respects.

Broussard, J., and Arguelles, J., concurred.

EAGLESON, J.— ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ I concur in the majority opinion, but write separately to highlight that aspect of the prosecutor's penalty phase arguments which persuades me that the death verdict must be reversed.

Until his closing remarks, the prosecutor's argument was, for the most part, unobjectionable. Indeed, his initial explanation to the jury of the scope of its sentencing responsibilities and discretion fully complied with *People v. Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440]. Had he stopped at that point, I would have no difficulty concluding that the jury in this case was not misled about the scope of its sentencing responsibilities.

However, the prosecutor did not stop there. After lunch while summarizing his argument in his concluding remarks, he stated in no uncertain terms: "*Whether or not Mr. Farmer should live or die was decided by the voters of this state when they passed this* [*death penalty*] *law, when they set the criteria. They decided who lives and who dies. You decide, does aggravating outweigh mitigating. That is your job. That is all you decide. The law does the rest. It is not you.* You are unfortunately picked here to do that which has to be done, decide whether or not aggravating outweighs mitigating. *You do not decide life or death. The law does that.*" (Italics added.)

The United States Supreme Court has unequivocally held that: "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633].)

I joined in the reversal of the death sentence in *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669], a case in which the prosecutor, in his closing argument at the penalty phase, "assured the jurors again and again that they did not have to 'shoulder the burden of personal responsibility,' told them again and again that the law 'protects' them from deciding what is 'just and right,' and even encouraged them to 'hide' behind the law. . . . In essence the jurors were told that the 'awesome responsibility' for the life and death determination did not rest with them." (*Id.*, at p. 257.)

In his final remarks to the jurors here, the prosecutor conveyed essentially the same message. He did not suggest that the law would "protect" them from the burden of reaching a just sentence. He did not encourage them to "hide" behind the law. Nevertheless, this jury was expressly told: "*You do not decide life or death. The law does that.*" (Italics added.)

Arguably, the prosecutor's choice of words was less egregious than the closing argument in *Milner*. Moreover, as Justice Panelli points out in his concurring and dissenting opinion, earlier in his closing argument the prosecutor did tell the jurors that the law furnishes "guidance" by requiring them to "weigh" aggravating and mitigating factors, did suggest that "[m]ercy does play a role," and did tell the jurors that they had "discretion" and should apply their "common sense." (Conc. & dis. opn., *post,* at p. 935.) Yet it is an inescapable fact that the prosecutor ultimately told the jury plain and simple: "You do not decide life or death. The law does that."

It is one thing for the prosecutor to emphasize the mandatory "shall" language of Penal Code section 190.3. This is not error per se because, "[a]s we explained in *Brown,* the jury makes its appropriateness determination *during* its normative weighing process. Then, based upon its determination of the weight of mitigating factors relative to aggravating factors, it chooses the appropriate penalty—life without possibility of parole if mitigating circumstances outweigh aggravating, or death if aggravating circumstances outweigh mitigating." (*People* v. *Boyde* (1988) 46 Cal.3d 212, 254 [250 Cal.Rptr. 83, 758 P.2d 25], italics added.) Thus, under our death penalty law, *implicit* in a jury's conclusion that the aggravating circumstances outweigh the mitigating is its normative determination that imposition of death is the appropriate penalty for the particular defendant and his particular

crimes. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1279, fn. 38 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Brown, supra,* 40 Cal.3d at p. 542.)

It is quite another thing for the prosecutor to tell the jury: "You do not decide life or death. The law does that," as happened here. The law does not, in and of itself, decide life or death. That "awesome responsibility" remains the sole, exclusive, and ultimate function of the jury. (*Milner, supra,* 45 Cal.3d at p. 257.)

Notwithstanding an otherwise proper closing argument, given the prosecutor's final remarks to the jury, I can find no principled basis upon which to distinguish this case from *Milner,* wherein we concluded that "the jury in this case was misled as to its discretion and its responsibility in reaching its sentencing verdict and that reversal is therefore mandated. (*Caldwell, supra,* 472 U.S. at pp. 340-341 [86 L.Ed.2d at pp. 246-247]; *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)" (*People* v. *Milner, supra,* 45 Cal.3d at pp. 257-258.)

I therefore concur in the majority's determination that the penalty verdict must be reversed.

**PANELLI, J.—** ██
 I concur in the affirmance of the judgment as to guilt and the sustaining of the special circumstance finding. However, I respectfully dissent from the reversal of the judgment as to penalty. In my view, there was no penalty phase error warranting reversal of the death judgment.

Defendant contends that the use of the word "shall" in the penalty phase jury instruction on the weighing of aggravating and mitigating factors (former CALJIC No. 8.84.2) was impermissible and mandates reversal. However, we have held that the use of the word "shall" in the 1978 law does not impermissibly limit the jury's discretion. (*People* v. *Brown* (1985) 40 Cal.3d 512, 542 [220 Cal.Rptr. 637 [709 P.2d 440].) The majority nevertheless takes the position that the instruction (former CALJIC No. 8.84.2), considered in combination with the prosecutor's closing argument, misled the jury regarding the scope of its sentencing discretion, not only in violation of *Brown,* but also in violation of *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] and *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669]. I find no such error and hence I cannot join in that conclusion.

As this court noted in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115], our concern in *Brown* was twofold. First, we emphasized that the word "weigh" did not connote a mere mechanical

counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to the factors. Second, we explained that use of the word "shall" should not be understood to require any juror to vote for the death penalty unless on completion of the weighing process he decides that death is the appropriate penalty under all the circumstances. "Thus," we explained in *Brown,* "the jury, *by weighing the various factors,* simply determines under the relevant evidence which penalty is appropriate in the particular case." (40 Cal.3d at p. 541, fn. omitted, italics added.) *Brown* called for clarifying instructions in the future, and said that prior cases should be examined on their merit to decide "whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion." (*People* v. *Brown, supra,* at p. 544, fn. 17.)

In the case at bench there is no question concerning the first potential area of confusion—the jury's discretion to weigh the applicable factors, to assign to each "whatever moral or sympathetic value" it deems appropriate. The prosecutor expressly counseled the jurors that their weighing of the mitigating and aggravating factors was "not a mechanical process or a mathematical process. You don't necessarily assign point scores to these things and just tally them up." He subsequently expanded on this theme: "The law doesn't say simply count up the 11 [factors] and say, well, there is five on one side, six on the other. . . . [¶] The law doesn't tell you which of these 11 you should find [to] be the most weighty or the most important. That is something you have to determine with the help of your fellow jurors, something you will have to determine by use of your common sense."

At issue, rather, is the second potential source of confusion—the scope of the jury's discretion to determine which is the appropriate penalty. In this connection, I note, as does the majority, that the prosecutor did indeed at one point in his summation suggest to the jury that its task was simply to determine whether the aggravating factors outweighed those in mitigation. Referring to the death penalty initiative, he stated that "Whether or not Mr. Farmer should live or die was decided by the voters of this state when they passed this law, when they set the criteria. They decided who lives and who dies. You decide, does aggravating outweigh mitigating? That is all you decide. The law does the rest. It is not you. You are unfortunately picked here to do that which has to be done, decide whether or not aggravating outweighs mitigating. You do not decide life or death." These comments, however, were made in the context of informing the jury that *"It is the law of this State* that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the State prison for life without possibility of parole in any case in which the special circumstance charged in this case has been specially found to be true. [¶] *Under the law of this*

*State you must now determine which of said penalties shall be imposed on the defendant.*" The judge will inform you, the prosecutor stated, that you must not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. . . . It will be very difficult for you to do. [¶] The question of what penalty is appropriate in cases like this is by nature an emotional subject. But the law says you can't decide this on emotion." Although the question of whether we should have a death penalty is by nature an emotional one, the voters have decided the issue—"[t]hat great debate is over. . . . *Now we're here to apply that law.* And all those things are not to be considered as relevant as they may seem. [¶] *We are now here to fairly and justly apply the law.*" (Italics added.)

Continuing, the prosecutor made it plain that in discharging their duty to fairly and justly apply the death penalty law, the jurors were to reach a normative decision whether death was the appropriate penalty under all the circumstances and that the determination of appropriate penalty was linked to and embraced within the discretionary weighing process. "Now, one word I have conspicuously left out in all these things that have no place [mere sentiment, conjecture, sympathy, passion, prejudice, emotion] is the word 'mercy.' Mercy does play a role. I am not going to deny that. Because you are not here to, as robots, go through the law and mechanically just impose it. [¶] You are here to do it with justice. You're here to do it in a human fashion, and that includes mercy. Justice includes mercy. If and only if mercy is warranted. . . . [¶] *This law which I'll be talking of . . . has mercy in it, too. That's what mitigation and aggravation is all about.*" (Italics added.)

Returning to this motif at a later point, the prosecutor stated the jury was "to consider and be guided by and take into account these categories of either mitigation or aggravation, and then you shall weigh them." It is not a mechanical process, but neither is it unstructured. "The law has given you the guidance. *That guidance is the weighing of aggravating versus mitigating. . . . [¶] So although it is structured, some of you may think it is too structured, it is not that structured. You do have discretion.* You have common sense, you have to apply it." (Italics added.)

In my view the foregoing comments clearly conveyed to the jurors that although "the law" provided for the death penalty, it would be their discretionary decision under the law that determined defendant's sentence, i.e., that by weighing the various factors, they determined under the relevant evidence which penalty would be appropriate. (See *Brown, supra,* 40 Cal.3d at p. 541.)

The prosecutor's total closing argument covers approximately 41 pages of transcript. Of this total, the prosecutor's argument dealing with the circum-

stances of the crime covers about 30 pages and 9 pages deal with a discussion of the factors of aggravation and mitigation. The portion of the argument the majority finds misleading covers less than a page and a half of the total. This is not a case like *Milner, supra,* 45 Cal.3d 227, where the thrust of the prosecutor's entire argument from beginning to end carried a common theme—that the law relieved the jurors of any personal responsibility for their decision, that the law determined their verdict and "protect[ed] them from deciding what is 'just and right.'" (45 Cal.3d at p. 257.) On the contrary, here the prosecutor from the very outset of his argument was urging the jury to consider the gravity of the circumstances of the crime in arriving at its decision. The challenged portion of his argument was minuscule in relation to the total argument. He repeatedly admonished the jury its role was to "fairly and justly" apply the law and emphasized that "mercy does play a role."

Accordingly, on the record before us, I have difficulty in believing that a jury, after having been expressly informed of its discretion to give the applicable factors whatever weight it deemed appropriate and of its duty to apply the law justly and "in a human fashion," which "includes mercy," would be misled by the brief remarks found offensive by the majority. Such a conclusion, in my mind, does an injustice to the intelligence of jurors. The jurors obviously listened to the entire argument of the prosecutor, not just the isolated few comments the majority cites.

As noted in *Milner, supra,* 45 Cal.3d 227, the court should not reach its determination of whether there is error "based on any single statement uttered by the prosecutor" but on an evaluation of the entire record. Having viewed the record as a whole, I conclude on balance that the jury was not misled as to the proper scope of its sentencing discretion. I find no *Brown, Caldwell* or *Milner* error.

I would affirm the judgment in its entirety.

Lucas, C. J., and Kaufman, J., concurred.

The petitions of both parties for a rehearing were denied February 23, 1989.