Filed 2/26/14  P. v. Caldwell CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>WILLIE CALDWELL,<br><br>          Defendant and Appellant. | A132665<br><br>(San Francisco County<br>Super. Ct. No. 214806) |

Willie Caldwell (appellant) appeals from a judgment entered after a jury found him guilty of receiving stolen property (Pen. Code, § 496, subd. (a)).[1]  He contends that the admission of an absent victim's statements to police violated the (1) confrontation clause and (2) the hearsay rule.  We reject the contention and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

An information was filed March 11, 2011, charging appellant with:  (1) robbery (§ 211, count I); and (2) receipt of stolen property (§ 496, subd. (a), count II).  The information also alleged that appellant had served two prior prison terms (§ 667.5, subd. (b)).

At a jury trial, San Francisco Patrol Sergeant Joseph McCloskey testified that on January 1, 2011, around 2:44 p.m., he and his partner were on routine patrol in a patrol car heading southbound on Market Street towards Sixth Street when approximately three pedestrians ran into the middle of the street and flagged them down, "pointing down

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

1

[Sixth] Street" and excitedly yelling that a woman "just got robbed" by a black male who was wearing a black jacket or a blue jacket. McCloskey called dispatch to report a "possible robbery." McCloskey and his partner drove a short distance towards Sixth Street and encountered a man and a woman at the first alley down Sixth Street. The man waved the officers down, pointed down Sixth Street, and yelled, "she's just been robbed, there he goes." The woman was "very distraught" and crying and "kept pulling" her "veil" over her eyes. The officers placed the woman in the patrol car. McCloskey's interaction with the man and woman lasted less than 10 seconds.

The officers drove a short distance towards another alley, where McCloskey saw more "animated" people flailing their arms and pointing and yelling, saying, "there he goes, blue jacket, blue jacket." One man was running and pointing towards a hotel at 93 Sixth Street, saying, "he is going in the hotel, he is going in right there." The officers pulled up to the hotel and McCloskey ran in the front door and up the stairs. He estimated that "at most" two minutes passed between the time he and his partner were first flagged down to the time he entered the hotel. There was no one in the hotel, but he heard some footsteps, so he ran down the hallway towards the area from where the sound was coming. At that point, a door that had a sign that read "garbage" opened and appellant stepped out towards him. The room from which appellant came out contained large garbage cans "where you deposit the garbage from the rooms." Appellant was a black man and was wearing a blue and black jacket. McCloskey told appellant to get on the floor, and appellant complied. Numerous other officers showed up and appellant was handcuffed and escorted downstairs to the sidewalk.

McCloskey told another officer, Calvin Lew, to "get the cold show admonition going." Another officer, Jordan Oryall, handed McCloskey a pink cell phone but did not indicate where he had gotten the phone.[2] McCloskey entered the patrol car in which the

---

[2]Oryall testified that he found the phone in appellant's pocket. He had gone to the hotel in response to a robbery call, and by the time he arrived and ran up the stairs, appellant was already being handcuffed. Oryall searched appellant for weapons and felt a

woman was sitting and asked, "is that him?" The woman replied, "yes." The woman's hands were "shaky" and she was still pulling on her veil. There were tear stains on her face and her eyes were very wet and puffy. At the time he entered the patrol car, McCloskey thought the woman's purse had been stolen, because "purse snatch[es]" are common in his patrol area. McCloskey therefore asked the woman what color her purse was. The woman responded, "It wasn't my purse. It was my cell phone. And that's my cell phone [the phone that McCloskey was holding] because I had it in my hand."

On cross-examination, McCloskey said he initially believed there was more than one suspect because it was not clear whether the pedestrians, who were yelling, were referring to one or more than one suspect. He may have told dispatch that "suspects" had entered the hotel. McCloskey did not recall telling dispatch that the suspect, who was five feet, eight inches, was "tall," even though the dispatch report stated, "tall, blue jacket." McCloskey testified that some of the pedestrians said the suspect's jacket was blue and some said it was black; no one said it was blue and black. McCloskey did not recall seeing appellant wearing a hat, even though a hat was found when appellant was booked into jail.

On re-direct examination, McCloskey testified that when he relays information to dispatch, "a lot of times" he can hear them tapping on the keys as they are trying to enter the information as quickly as possible, and that "little mistake[s]" can occur. He testified that when he said "suspects," he did not necessarily mean there were two or more suspects. As he got more information, it became clear to him that there was just one suspect.

Officer Lew testified that on the day of the incident he and his partner were on duty when they heard a dispatch call and responded to the hotel. They arrived at the hotel a minute or two minutes later, and he went inside a patrol car in which the victim was sitting. The victim appeared to have been crying and was frightened, and was breathing heavily as if she was hyperventilating. Appellant came down the stairs and the victim

square object in appellant's pocket. He retrieved a cell phone and gave the phone to McCloskey at the scene.

identified appellant. McCloskey asked about a purse but the victim said, "it's not a purse. It's my phone." The victim described the phone, and McCloskey showed a pink iPhone to the victim. The victim said, "yeah, that's my phone." The parties stipulated that appellant did not live at the hotel. Lew testified that he did not know whether appellant knew anyone at the hotel.

The manager of the hotel testified for the defense. He testified that the hotel had working surveillance cameras inside the hotel on the day of the incident. There was no one working at the front desk that day. No one from the police department called to inquire about obtaining surveillance videos from that day. On cross-examination, he testified that he had worked at the hotel for 10 years and had no recollection of appellant living there or visiting the hotel. He knew of no reason for appellant to be inside the garbage room.

The trial court granted appellant's motion for a directed verdict of acquittal on the robbery count. Thereafter, the jury returned a guilty verdict on count II, receiving stolen property. The jury found true the prior prison terms. The trial court sentenced appellant to five years, consisting of the upper term of three years on count II and two consecutive one-year enhancements for the two prison priors.

## DISCUSSION

### *Evidence Code section 402 hearing*[3]

McCloskey and Lew testified in a pre-trial Evidence Code section 402 hearing to resolve appellant's confrontation and hearsay objections.

In the mid afternoon on January 1, 2011, McCloskey and his partner were on routine patrol, driving on Market Street towards Sixth Street, when they were contacted by three or four people who were pointing and yelling that someone had "just been robbed" by a black male in a blue jacket. The people were "very excited[]," and one person was "jumping up and down." They said, "It just happened. Hurry up. She was

_____

[3]Although the evidence elicited at the Evidence Code section 402 hearing is very similar to the evidence elicited at trial, we will summarize the testimony from that hearing in some detail in order to address appellant's contentions.

4

robbed[.] She was robbed." McCloskey and his partner turned onto Sixth Street, where people on both sides of the street were pointing and yelling. McCloskey stopped to contact a man and a woman. The man said that the woman had "just got robbed" and "there he is in a blue jacket, black guy. . . ." The woman was young, about four feet, five inches tall, and appeared to weigh about 75 or 80 pounds. She was very emotional and crying, and was "like shaking." She "kept trying to pull her head scarf back on down her face."

McCloskey had the woman get in the patrol car, and as they drove a short distance towards another alley, several people pointed to a hotel at 93 Sixth Street and yelled, "he's there." They were "very animated," waving their hands and yelling, "He is there. He is there. You gotta get him. You gotta get him." One person pointed at the hotel and yelled, "He just ran in there. . . . There is [the] hotel that he ran into." McCloskey estimated that less than 10 seconds elapsed between the time he was first flagged down on Market Street and his contact with the woman. He estimated that the encounter with the woman and man in the alley also lasted less than 10 seconds. McCloskey told dispatch that they were looking for a robbery suspect. He reported the offense as a "purse snatch," and told dispatch that he was going to the hotel and needed assistance. He did not know what property had been taken or whether the perpetrator had a weapon.

Within seconds of pulling up to the hotel, McCloskey jumped out of the patrol car and ran up the stairs. Once inside, he heard what he thought was a door closing, so he ran down a hallway to a door that he thought led to a stairwell. As he approached the door, appellant stepped out wearing a blue jacket. McCloskey drew his firearm and told him to get on the floor. There was no one else in the hallway. Appellant matched the "very limited physical description" provided by the witnesses. Another officer who had responded, Oryall, handed McCloskey a phone that he had gotten from appellant's person.

Lew arrived at the hotel as appellant was being taken into custody. Lew ran upstairs to the first floor where he encountered McCloskey, who told him to start a "cold show" procedure with the woman in the patrol car. Lew immediately went downstairs,

5

obtained a "cold show form," and contacted the woman.  The woman was emotional, was patting her eyes, and was "heaving . . . like sniveling, a strange sound," "similar to the sounds little kids make when they stop crying."  Lew read from the form, asked her to read it, asked her if she understood it, and had her sign it.[4]  Within a minute, appellant was brought out onto the sidewalk and Lew asked the woman whether appellant was the person who had taken her property; she nodded.  He told her she had to answer verbally and she said, "Yes."

Lew testified that the purpose of the written admonition procedure is, among other things, to make a record of the witness's response, refresh the recollection of the officer and witness in court, and ensure that all officers use the same wording, so that "if we ever have to produce it in court, . . . I can produce the form and read [it] off."  The purpose of requiring identification verbally rather than by a nod was "to cover" himself in court against the misinterpretation of the nod.

Lew testified that immediately after the woman identified appellant, McCloskey got back into the patrol car.  The woman's eyes were still "very wet" and filled with tears.  She appeared "traumatized," was shaking a little, and kept "fidgeting with her scarf."  Lew testified that McCloskey asked, "Is this the guy?"  McCloskey testified that he asked, "[Is] that the guy who did it?"  The woman said, "yes."  McCloskey testified that he asked the woman this question because he "wanted to be clear that there was only one suspect, that we weren't look[ing] for anybody else."  He did not know whether there were any other perpetrators, and he did not know if weapons were involved.

McCloskey then asked the woman "what color her purse was."  He testified that he did so because he assumed that the perpetrator had taken a purse.  According to Lew,

---

[4]The form was entitled "San Francisco Police Department Cold Show Admonition and Report" and stated, "Police Department personnel intend to take you to a location where you will be asked to look at a person(s) to help determine if that person(s) committed the crime.  The person(s) you will see may or may not be the perpetrator(s) of the crime being investigated by the police.  You should not assume that the person(s) you will look at committed the crime.  You are under no obligation to identify anyone.  You should not discuss this matter with any other victims/witnesses.  Please sign your name to confirm that you have read and understand the above.

McCloskey had instructed other officers to search the garbage cans for the woman's purse. The woman responded that her purse was not taken, and that it was her pink cell phone that had been taken. McCloskey was holding the pink cell phone and asked, "[I]s that your phone?" She said, "yes." McCloskey estimated that the entire incident, i.e., from the first contact with the three or four pedestrians on Market Street to the time that appellant was identified, lasted about three minutes.

*Confrontation clause*

**General principles**

Admission of "testimonial" statements without an opportunity for cross-examination violates the federal right of confrontation. (*Crawford v. Washington* (2004) 541 U.S. 36, 51, 53–54 (*Crawford*).) Although *Crawford* did not provide a comprehensive definition of the word "testimonial," it noted that it includes " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id.* at p. 52.)

In *Davis v. Washington* (2006) 547 U.S. 813, 821–824 (*Davis*), the Supreme Court consolidated two domestic violence cases—*Davis v. Washington* and *Hammon v. Indiana*—and defined the contours of the confrontation clause in emergency situations. In the *Davis v. Washington* case, the victim called 911 as she was being attacked by her assailant, and in response to questions by the 911 operator, said that the assailant was "jumpin' on" her and that he was using his fists and had no weapons. (*Davis*, *supra*, 547 U.S. at p. 817.) The Supreme Court concluded that the circumstances of the questioning by the 911 operator "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." (*Id.* at p. 828.) The Court stated that the victim was not "acting as a witness" or "testifying," and that "[w]hat she said was not 'a weaker substitute for live testimony' at trial . . . ." (*Ibid.*, italics omitted.)

In *Hammon v. Indiana*, police responded to a domestic disturbance call at a home, and the victim was alone on the front porch when the two officers arrived. She appeared somewhat frightened but said " ' "nothing was the matter." ' " (*Davis*, *supra*, 547 U.S. at p. 819.) Inside the house, the defendant told the officers that he and the victim had been

arguing, but that it never became physical. (*Ibid.*) While one officer remained with the defendant, the other spoke to the victim in another room. (*Ibid.*) There, the victim told the officer that the defendant broke the phone, lamp and heater, and that he threw her down into the glass of the heater and punched her in the chest, among other things. (*Id.* at p. 820.) The Supreme Court concluded, "There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing. . . ." (*Id.* at p. 829.) The victim had "told them that things were fine [citation] and there was no immediate threat to her person." (*Id.* at p. 830.) The Court concluded, "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer should have done." (*Ibid.*, italics omitted.) The Court held that the statements were therefore inadmissible under *Crawford.* (*Ibid.*)

In *Michigan v. Bryant* (2011) ___ U.S. ___, [131 S. Ct. 1143], the United States Supreme Court clarified the meaning of an "ongoing emergency" and whether the primary purpose of a police interrogation is to obtain evidence or resolve the emergency. The Court stated, "To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' [citation], which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." (*Id.* at p. 1156.) The Court stated, "The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' [Citation.] Rather, it focuses them on 'end[ing] a threatening situation.' [Citation.] Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." (*Id.* at p. 1157, fn. omitted.)

8

The California Supreme Court explained the *Davis* rule in *People v. Cage* (2007) 40 Cal.4th 965, 984, as follows: "We derive several basic principles from *Davis*. First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined " 'objectively,' " considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (Fns. omitted, italics omitted.)

### Trial court's ruling

The trial court ruled that under the "very unusual" circumstances of the case, the victim's response ("Yes") to McCloskey's question, "Is that the guy who did it?" was not testimonial. The court stated, "This is a very particular situation and a very particular set of unusual facts where the crime occurred, and within seconds, and at most, 2 minutes, a suspect was apprehended. And they needed to be sure that the defendant was, in fact, that suspect. Because if he wasn't, they were still right in the very area where the incident occurred and could have continued their investigation." The court stated that McCloskey, who thought it was "a purse snatch," had had no time to interrogate the victim, or even ask her before he apprehended the suspect, if the incident was a purse snatch or the taking of money, or a cell phone. His inquiries "[we]re not structured

9

questions, and he [was] concerned about getting the right person." The court also noted that the public was making "all of these spontaneous statements" and wanted the suspect apprehended, and that McCloskey had to quickly figure out whether "the threat to the victim . . . [and] the public ha[d] been neutralized." "So while the cold show admonition and that more formal procedure is taking place, McCloskey . . . goes in the car and asks his questions." "He is so concerned, he doesn't even wait for the results of any cold show."

The court ruled that the cold show, on the other hand, was "a more formal procedure," and that the identification that the victim made to Lew after being presented with the admonition form was testimonial. The court stated, "There was . . . a transition period there. McCloskey didn't transition. He was still trying to find out the perpetrator. But the formalized document transitions the case into an investigation to be used in court." The court ruled, "And so I'm not going to allow you to use the cold show form, or get the nod of the head from Officer Lew about the victim nodding her head, or Officer Lew being able to confirm that she identified the defendant or the cell phone."

### Appellant's argument

Appellant contends the trial court should have excluded not only the victim's statements to Lew, but also the statements she made to McCloskey because all of her statements were testimonial, and therefore inadmissible, under the confrontation clause.[5] We disagree.

McCloskey's need to immediately pursue the suspect into the hotel prevented him from learning about the crime, e.g., whether any weapons were involved or what item or items had been taken. He was handed a pink cell phone at the scene, but was unaware that that was the item that had been taken from the victim. He was also uncertain as to whether he had apprehended the correct person, or whether there were any other suspects.

---

[5]Appellant spends a significant portion of his brief explaining why he believes the victim's statements to Lew were testimonial. We need not address this issue because the trial court determined—and the Attorney General (respondent) does not dispute—that the victim's statements to Lew were testimonial and properly excluded.

Because the incident occurred quickly, and in a small geographic area of one or two blocks, McCloskey would have been able to pursue the perpetrator if appellant was not the correct person, or if there were more suspects involved. In other words, time was of the essence. And, as the trial court noted, "the threat to the victim . . . [and] the public" had not yet been "neutralized." Thus, even though McCloskey knew that a cold show procedure was taking place or had taken place, he did not take the time to ask Lew about the status or results of the procedure. Instead, he entered the car and immediately asked the victim a brief, direct, and informal question—whether appellant was "the guy." Under the circumstances of this case, the trial court could reasonably determine that from an objective point of view, the primary purpose of McCloskey's inquiry was to address an ongoing emergency of finding the perpetrator(s), not to produce evidence about past events for possible use at a criminal trial.

Appellant argues that the fact that Lew had already administered a cold show procedure rendered the victim's subsequent statements testimonial because McCloskey's inquiry was simply a continuance of the cold show procedure. McCloskey, however, was not the person who administered the cold show procedure and did not know the results of the inquiry. He was not trying to clarify or confirm the responses the victim had given to Lew. Rather, McCloskey addressed the victim for an entirely different reason—to resolve the emergency by determining whether he had the right suspect. Appellant also asserts any emergency had ended because the victim had already identified appellant to Lew. At the time McCloskey approached the victim in the patrol car, however, he was unaware that appellant had been identified. (See *Davis*, *supra,* 547 U.S. at p. 822 [analysis of whether a statement is testimonial focuses on what a reasonable person would deem to be the intention of *the interrogator*].) As the trial court stated, "You have to look, I think at the officer's intent. You have to look at where these statements were taken, and they were taken right at the very area where the incident occurred." "[McCloskey] doesn't know once Mr. Caldwell is detained and handcuffed if, in fact, this is the alleged perpetrator . . . So he doesn't know that a weapon is used and/or not. He

11

hasn't had time to ask these questions. All he knows is the fact that the public is upset and a robbery, he believes, has taken place." We conclude there was no error.

We also conclude that even assuming the trial court erred in admitting the victim's statements to McCloskey, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 23.) The court granted the defense motion for judgment of acquittal on the robbery count. Thus, the only issue was whether appellant was in possession of property that he knew had been stolen. (§ 496, subd. (a).) Numerous people on the street indicated that a robbery had occurred and that the suspect was a black man wearing a black jacket or a blue jacket. Appellant matched that description—with the exception that his jacket was black *and* blue—and was seen by those witnesses running down the street and entering a hotel in which he did not live and had never stayed. Moments later, he was found in the hotel's garbage closet. There was no one else in the hallway. The hotel manager, who had been at the hotel for 10 years, said he knew of no reason why appellant would be in the hotel's garbage closet. Thereafter, appellant was apprehended by police, who found a pink cell phone in appellant's pocket—a phone which the victim, who was visibly shaken, spontaneously identified as hers when asked what color her purse was. In addition, when McCloskey offered to return the phone to the victim, she accepted it, also indicating that the cell phone belonged to her. Because there was ample evidence for a jury to reasonably find that appellant was guilty of receiving stolen property, any error in admitting the victim's statements to McCloskey was harmless beyond a reasonable doubt.

### *Hearsay*

### General Principles

Evidence Code section 1240 allows admission of a hearsay statement if it "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." To be admitted under this exception, " ' "(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must

12

have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Lynch* (2010) 50 Cal.4th 693, 751–752, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636–643.) "[A]n answer to a simple inquiry" is more likely to be found spontaneous," while "more detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity." (*People v. Farmer* (1989) 47 Cal.3d 888, 904, disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) The trial court must consider each fact pattern on its own merits and is vested with reasonable discretion in the matter. (*People v. Farmer*, *supra*, 47 Cal.3d at p. 904.)

### Trial court's ruling

The trial court ruled that the victim's statement to McCloskey fell within the hearsay exception under Evidence Code section 1240 because they were excited utterances. The court stated, "She is upset. She is crying. She is scared. Her eyes are filled with tears. She is fidgeting with her scarf. She looks traumatized. And even after she is placed in the patrol car, she is heaving and she is taking in her breath and expelling her breath in such a way that appears as though she has just finished crying. So she is very upset when she gives the identification of both the cell phone and the perpetrator."

### Appellant's argument

Appellant contends the trial court erred in admitting the victim's statements under the spontaneous statement exception to the hearsay rule. We disagree. The record supports the court's finding that at the time the victim identified appellant, she was still upset by the incident that had just occurred only a few minutes earlier. When McCloskey first encountered the victim, she was very emotional and crying and was "like shaking. She was very upset [and] traumatized" and "kept trying to pull her head scarf back on down her face." Appellant argues that because Lew's "formally-admonished single-suspect showup procedure" was "suggestive" and also "prompted reflection by the [victim]," her statements were not made spontaneously. However, there was evidence

13

that very little time passed between the time of the admonition and McCloskey's questions and that the victim was still traumatized and in an excited state at the time. She was "fidgeting" and shaking, and her eyes were filled with tears. According to Lew, the victim was heaving or sniveling and he had to tell her to relax and calm down.

Moreover, the statement was made in response to McCloskey's brief and informal inquiry. (See *People v. Morrison* (2004) 34 Cal.4th 698, 718–719 [shooting victim's response to officer's question "who did it?" was properly admitted as a spontaneous statement].) *Morrison* stated, "courts have found or recognized that statements purporting to name or otherwise identify the perpetrator of a crime may be admissible where the declarant was the victim of the crime and made the identifying remarks while under the stress of excitement caused by experiencing the crime." (*Id.* at p. 719, citations omitted.) There was no error.

In any event, for the reasons set forth above, any error in admitting the victim's statements to McCloskey was harmless beyond a reasonable doubt. Thus, appellant has failed to show he was prejudiced by the ruling.

**DISPOSITION**

The judgment is affirmed.

14

_____
McGuiness, P.J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.