Filed 10/6/17

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| THE PEOPLE, | C075909 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F04738) |
| v. | |
| DEMETRIUS WAYNE MAYS, | |
| Defendant and Appellant. | |


        APPEAL from a judgment of the Superior Court of Sacramento County, Michael A. Savage, Judge.  Affirmed.

        Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Senior Assistant Attorney General, Carlos A. Martinez and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through VII.


1

Defendant Demetrius Wayne Mays and several of his relatives went with Charles Williams to confront Marcel Hatch, who had previously beaten Williams. When the group arrived, Williams shot and killed Hatch. A jury convicted defendant of voluntary manslaughter, with an enhancement that a principal was armed, and the trial court sentenced him to 12 years in state prison. On appeal, defendant contends that the trial court improperly ordered him to pay restitution to the estate of the victim's mother for the victim's funeral and burial expenses paid by the mother before her death. We conclude the restitution order was proper because (1) the victim's mother was, herself, a victim under the restitution statute and (2) the funeral and burial expenses were incurred before she died.[1]

BACKGROUND

Our resolution of defendant's contentions on appeal does not require a detailed recitation of the facts.

Defendant's sister Candence worked as a prostitute. Charles Williams was her pimp and boyfriend. Hatch, the victim, also was a pimp, and Ashanti Lewis was a prostitute who worked for him. Candence and Lewis competed for "dates" at the Econo Lodge on Auburn Boulevard in Sacramento.

On May 7, 2010, Williams hassled Lewis at the Econo Lodge. The same day, Hatch yelled at and spat on Candence. Hatch also fired several rounds in the air near

---

[1] Defendant's other contentions on appeal are also without merit. He contends: (1) the trial court's instruction to the jury using CALCRIM No. 373 improperly diverted the jury's attention away from Williams's responsibility for the killing; (2) the trial court erred by not giving an instruction on proximate causation; (3) the trial court improperly gave a consciousness of guilt instruction using CALCRIM No. 371 where the suppression of evidence was not intended to conceal defendant's participation in the crime; (4) the trial court improperly answered the jury's question about how aiding and abetting applies to voluntary manslaughter; (5) the trial court abused its discretion by allowing speculative testimony and argumentative questions; and (6) the trial court erred by admitting hearsay evidence.

2

Candence. Williams confronted Hatch, and Hatch beat up Williams. Hatch also stole some items from Williams. Williams was unconscious for a few minutes. After he regained consciousness, he got into his car and eventually drove away.

The next day, May 8, Candence and Williams went to the apartment of defendant's parents. Williams's face was swollen and distorted. Defendant was also at the apartment, and Candence told him that Hatch spit on her and hit her.

Candence asked defendant to talk to Hatch. Defendant and some of his siblings went with Williams in a black SUV to Econo Lodge. Lewis was there, but not Hatch.

Defendant texted a friend about obtaining a gun but was unsuccessful. Defendant's father had a Saiga rifle, similar to an AK-47.

That evening, the black SUV made a second trip to Econo Lodge. Defendant's sister Brandy drove, with defendant's brother Lorenzo in the front seat. Although there was some disagreement in the testimony about who sat where in the rest of the vehicle, defendant was also in the vehicle, along with Williams and defendant's brother Kenyatta. Defendant carried a jacket out from his parents' apartment and placed it on the floor or seat of the SUV.

At the Econo Lodge, defendant and Williams got out of the SUV. Defendant testified that, as he walked toward Hatch, he thought he saw something chrome under Hatch's shirt. Williams had the Saiga rifle from defendant's parents' apartment. Hatch ran, but Williams gave chase and shot at Hatch, inflicting wounds that eventually resulted in Hatch's death.

The group went back to the parents' apartment, and defendant's father called the police to report that the rifle had been stolen. Defendant's parents told him to get rid of the rifle, so he took it, covering it with his jacket, and disposed of it in a river near Roseville.

Defendant was charged with murder, but a jury found him not guilty of murder and guilty of voluntary manslaughter. (Pen. Code, § 192, subd. (a).) The jury also found

3

true the allegation that a principal was armed with firearm. (Pen. Code, § 12022, subd. (a)(1).)

The trial court imposed the upper term of 11 years for voluntary manslaughter with a consecutive one-year term for the firearm enhancement.

DISCUSSION

I

*Victim Restitution*

In defendant's probation report, the probation officer wrote, "Restitution is being recommended in the amount of $9,130.00 payable to Carolyn P. for the cost of the funeral and burial expenses . . . ." In handwriting, someone interlineated that the payment was to be to "the estate of" Carolyn P. The probation report noted that (1) Carolyn P. was Hatch's mother; (2) she was severely affected by Hatch's death; (3) she constantly pictured him lying on the ground bleeding; and (4) she cried every day that he was buried in the " 'cold, hard ground.' "

At the sentencing hearing, the prosecutor asked the court to make restitution for Hatch's funeral and burial expenses payable to Carolyn P.'s estate, as she had passed away. Defense counsel said, "This is an issue I have never had come up in terms of restitution survivable to an estate. So for the record I would object. I have no idea what the law is." The trial court ordered "restitution to the estate of Carolyn P[.] in the amount of $9,130."

In his opening brief on appeal, defendant contends that the trial court improperly ordered him to pay restitution to Hatch's mother for Hatch's funeral expenses because Hatch died before those expenses were incurred, citing *People v. Runyan* (2012) 54 Cal.4th 849 (*Runyan*). The Attorney General attempted to concede the issue, noting that Hatch died before the funeral and burial expenses were incurred.

In *Runyan*, the defendant, while driving drunk, caused an accident that killed another driver. (*Runyan, supra*, 54 Cal.4th at p. 853.) At sentencing, the court ordered

4

the defendant to pay restitution to the victim's estate for various expenses, including funeral and burial expenses. (*Id.* at pp. 854-855.) On review, the California Supreme Court held that the restitution award to the victim's estate for expenses that arose after the victim died was not authorized under Penal Code section 1202.4 because (1) the victim did not personally incur the expenses and (2) the estate of the victim was not, itself, a victim under the statute. (*Runyan, supra*, at pp. 857-859.)

We requested supplemental briefing and asked the parties to consider, among other things, whether the restitution order was proper because Hatch's mother was the victim for purposes of restitution.[2]

In his supplemental brief, defendant acknowledges that Hatch's mother was a victim under Penal Code section 1202.4, subdivision (k)(1), which provides that, for the purposes of restitution under that section, "[t]he immediate surviving family of the actual victim" is also a "victim." He also acknowledges that Hatch's mother was alive when Hatch's funeral and burial expenses were incurred and that, because she was alive when

---

[2]  Specifically, we asked the parties to answer the following questions:

"1.    Was Carolyn P. a victim of defendant's crime? Discuss Pen. Code, § 1202.4, subd. (k)(1) as well as any other pertinent authority.

"2.    Assuming for the purpose of argument that Carolyn P. was a victim of defendant's crime, is there sufficient evidence in the record that Carolyn P. was alive when the funeral and burial expenses for her son were incurred?

"3.    Assuming for the purpose of argument that Carolyn P. was a victim of defendant's crime and that she was alive when the funeral and burial expenses for her son were incurred, was the trial court's restitution order payable to the estate of Carolyn P. appropriate? Discuss *Runyan, supra,* 54 Cal.4th at p. 857 ['When the actual victim of a crime has died, the estate, acting in the decedent's stead, steps into the decedent's shoes to collect restitution owed to the decedent, but which the decedent cannot personally receive because of his or her death'], as well as any other pertinent authority.

"4.    Did defendant forfeit consideration of the restitution issue by failing to object in the trial court?"

5

Hatch's funeral and burial expenses were incurred, the award of restitution to the estate of Hatch's mother was not barred by the holding in *Runyan* that restitution cannot be ordered for expenses incurred by a victim's estate after the victim's death.  He asserts, however, that there is no evidence in the record that Hatch's mother personally incurred those funeral and burial expenses.  Finally, defendant contends that he did not forfeit his restitution contentions by failing to make an adequate objection in the trial court because whether restitution was available was an issue of law, not of fact.  In the alternative, defendant contends that any forfeiture for failure to make an adequate objection constituted constitutionally ineffective assistance of counsel.  We address each of these issues.

First, *Runyan* does not bar restitution on the ground that the funeral and burial expenses were incurred after Hatch's death, as defendant acknowledges in his supplemental brief, if those expenses were incurred by Hatch's mother, who was a victim under Penal Code section 1202.4, subdivision (k)(1).  But defendant asserts that, because there is no evidence in the record that Hatch's mother personally incurred those expenses, we cannot sustain the restitution award to her estate.  He argues:  "For all we know, someone other than Carolyn P. paid for these expenses, and she was simply trying to recoup the other person's outlay at sentencing."  Defendant's supplemental brief on appeal is the first time he has raised this issue of who personally incurred Hatch's funeral and burial expenses, as he raised it neither in the trial court nor in his opening or reply brief on appeal.

It is too late for defendant to contend that the restitution order was improper on the ground that the prosecution did not present evidence that Hatch's mother personally incurred the funeral and burial expenses associated with Hatch's death because:  (1) this is not a question of law and (2) defendant could have, but did not, challenge the factual basis for the restitution order in the trial court.

6

Defendant argues in this supplemental brief that it was not necessary to object to the factual basis of the restitution order in the trial court because the issue raised on appeal is one of law. (See *Green v. Superior Court* (1985) 40 Cal.3d 126, 138 [new theory may be raised on appeal if evidence relevant to theory fully developed in trial court].) He writes: "Here the issue is purely one of law: whether any evidence was placed on the record that showed the victim Carolyn P. had personally incurred the expenses at issue." To the contrary, the issue is factual, and the record concerning this factual issue was not fully developed in the trial court. A defendant wishing to argue on appeal that there is no factual basis for a restitution order must object on that ground in the trial court to preserve the issue for appeal. (*People v. Anderson* (2010) 50 Cal.4th 19, 26, fn. 6 ["Defendant . . . waived a claim of error as to the amount of restitution by failing to object on that ground in the trial court"]; *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 ["[B]y his failure to object, defendant forfeited any claim that the order was merely unwarranted by the evidence, as distinct from being unauthorized by statute"].) Since defendant did not object in the trial court on this ground, he forfeited consideration of the issue on appeal.

Defendant contends that, if the failure to object in the trial court resulted in forfeiture, his trial attorney was constitutionally deficient for having failed to object. This approach is fruitless because defendant cannot show prejudice. He cannot establish that Hatch's mother did not incur the funeral and burial expenses.

To prevail on his ineffective assistance claim, defendant must show: (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] (*Strickland*).) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course

7

should be followed." (*Id*. at p. 697.) Because, on this record, we can only speculate as to (1) whether Hatch's mother personally incurred the funeral and burial expenses or (2) whether an objection to the factual basis of the restitution order would have benefitted defendant, there is no prejudice shown. Therefore, defendant's ineffective assistance of counsel argument is without merit.

## II

### *CALCRIM No. 373*

Defendant contends the trial court erred by instructing the jury using CALCRIM No. 373 because the instruction, in defendant's words, "unfairly misled the jury into ignoring Williams' sole responsibility for the crime." We conclude defendant forfeited this contention by failing to object to the instruction and, in any event, the contention is without merit.

The court instructed the jury, using CALCRIM No. 373, as follows:

"The evidence shows that other persons may have been involved in the commission of the crime charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime charged."

A. *Forfeiture*

A defendant forfeits contentions of instructional error if he fails to object to the instruction in the trial court, unless the error affects his substantial rights. (*People v. Prieto* (2003) 30 Cal.4th 226, 247.) The instruction here did not affect defendant's substantial rights, as we discuss next. Therefore, he forfeited consideration of the contention on appeal.

B.     *Merits*

Defendant argues that:  (1) the language of the instruction implied that he (defendant) was involved in the crime, (2) the instruction, again in defendant's words, "did nothing to dispel the jury's natural instinct to hold someone responsible for the killing of Hatch," and (3) CALCRIM No. 373 conflicted with CALCRIM Nos. 400 and 401, because those instructions required the jury to determine the culpability of a person not being prosecuted in order to consider defendant's liability as an aider and abettor. None of these arguments has merit.

First, the language of the instruction did not imply that defendant was involved in the crime.  Defendant cites, in particular, the following language from the instruction: "The evidence shows other persons may have been involved in the commission of the crime charged against the defendant."  According to defendant, this implied that defendant was involved in the crime.  To the contrary, this sentence says nothing about defendant's involvement but instead merely notes that others may have been involved in the crime charged, which appears to have been the case here.  The jury was instructed to determine defendant's culpability and convict only if it found him guilty beyond a reasonable doubt.  (CALCRIM No. 220.)  Defendant gives us no reason here to believe the jury abandoned its duty and drew an unreasonable and unfounded inference from this instruction that the court was telling the jury that defendant was involved in the crime. (*People v. Chavez* (1958) 50 Cal.2d 778, 790 [presumption that jury followed court's instructions]; see also *People v. Farmer* (1989) 47 Cal.3d 888, 918-919 (*Farmer*) [instruction on unjoined perpetrators does not interfere with a third party culpability defense], overruled on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

Second, defendant's argument that the jury instruction had to "dispel" some vague "natural instinct" on the part of the jury to hold someone responsible for the crime is

9

insufficient to raise a concern with the instruction.  Again, the jury was properly instructed to determine defendant's guilt on the evidence presented.

And third, CALCRIM No. 373 does not conflict with the aiding and abetting instructions.  CALCRIM No. 373 does not instruct the jury to disregard any other person's culpability for the crime.  To the contrary, the instruction only cautions the jury not to speculate as to why others are not being prosecuted for the crime.  Nowhere does the instruction prevent the jury from determining defendant's aiding and abetting liability based on the criminal liability of the other actors involved.  "[T]he instruction does not tell the jury it cannot consider evidence that someone else committed the crime.  [Citation.]  It merely says the jury is not to speculate on whether someone else might or might not be prosecuted."  (*Farmer, supra,* 47 Cal.3d at p. 918 [considering predecessor instruction CALJIC No. 2.11.5], italics omitted.)

### III

### *Instruction on Proximate Cause*

Defendant contends, in his opening brief, that the trial court erred by not instructing the jury sua sponte concerning proximate causation, which he asserts should have been done because his defense was based on the theory that Williams's shooting of Hatch was unforeseeable.  The Attorney General responds that the court instructed the jury on proximate causation in connection with the murder instruction.  Defendant replies that, because he was convicted only of voluntary manslaughter, the instruction given as to murder did not suffice.  We conclude that (1) defendant forfeited this contention by failing to object to the instructions as given (see the discussion on forfeiture in part II) and (2) the jury was sufficiently instructed on proximate causation.

Defendant asserts on appeal that one of his defenses at trial was that "Williams' acts were an independent intervening cause of the victim's death for which [defendant] was not legally responsible."  He therefore contends a proximate causation instruction

10

should have been given so the jury could determine whether Williams's acts were unforeseeable and a supervening cause of the death.

Contrary to defendant's suggestion, the trial court properly instructed the jury on proximate causation.

In its instruction concerning murder, the court apprised the jury of the elements of murder, including that "[t]he defendant committed an act that caused the death of another person." The court also instructed concerning proximate causation, using the words of CALCRIM No. 520, as follows:

"An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (Italics omitted.)

This instructional language is adequate to educate the jury concerning proximate causation, foreseeability, and supervening causes. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 369-374.)

The trial court did not reiterate the proximate causation information in its voluntary manslaughter instruction. However, the court instructed the jury: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the shooter killed a person because he acted in imperfect self-defense or imperfect defense of another."

In his opening brief, defendant fails to mention that, within the instruction on murder, the court included instructions on proximate causation. In his reply brief, he acknowledges that the murder instruction included the proximate causation language, but

he complains that the trial court did not apply the proximate causation language to voluntary manslaughter.

Defendant's argument is unpersuasive because the trial court told the jury that it could not consider a voluntary manslaughter verdict unless it found "[a] killing that would otherwise be murder," but for "imperfect self-defense or imperfect defense of another." In other words, following the trial court's instructions, the jury found the elements of murder present but reduced the crime to voluntary manslaughter based on imperfect self-defense or imperfect defense of another. There was no other way under the instructions given by the court for the jury to arrive at the voluntary manslaughter conviction. Therefore, the jury necessarily applied the proximate causation language as found in the murder instruction before continuing on to whether the killing was a voluntary manslaughter instead of murder.

Defendant's contention that the trial court failed to give a proximate causation instruction is without merit.

IV

*Consciousness of Guilt Instruction*

Because there was evidence that defendant disposed of the weapon by throwing it into a river, the trial court instructed the jury concerning the inference that could be drawn from this evidence that defendant was conscious of his own guilt. Defendant contends the instruction was improper because defendant did not dispose of the weapon to hide his complicity in the crime. We reject the contention because (1) defendant forfeited consideration of this issue by failing to object to the instruction in the trial court (see the discussion of forfeiture in part II) and (2) the instruction was supported by evidence that defendant disposed of the rifle to conceal evidence of his guilt.

At trial, there was evidence that defendant threw the rifle used to kill Hatch into a river. He testified that he disposed of the rifle because the rifle could implicate him and the others who were with him in the killing of Hatch. There was also evidence that he

12

disposed of the rifle because his father, who had recently bought the gun, told him to. Defendant's father called the police and falsely reported the rifle stolen.

The trial court instructed the jury on consciousness of guilt using CALCRIM No. 371:

"If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

On appeal, defendant claims that "the reason [defendant] disposed of the rifle is that his parents had asked him to do so, apparently to deflect any suspicion from the father, who had recently purchased the gun." To the contrary, defendant testified that he disposed of the rifle to hide evidence inculpating himself and others with him. Therefore, defendant's claim is contrary to the record and without merit.

Defendant also claims that consciousness of guilt instructions should be given only if a person suppresses evidence to hide his complicity in the crime, citing *People v. Kimble* (1988) 44 Cal.3d 480, 498. That argument does not help defendant because he suppressed the evidence to hide his complicity in the crime.

V

*Court's Answer to Jury Question*

During deliberations, the jury sent a question to the trial court concerning how the theory of aiding and abetting applies to voluntary manslaughter. The court responded that the theory of aiding and abetting applies equally to all forms of homicide. On appeal, defendant contends this response did not answer the jury's question adequately. We conclude: (1) defendant forfeited this contention by failing to raise it in the trial court and (2) the trial court's answer was a correct statement of the law and was responsive to the jury's question.

13

During deliberations, the jury sent the trial court the following question: "Clarification on aiding and abetting in regards to manslaughter. Instructions of manslaughter only take into call [*sic*, read account] the shooter." The court and counsel discussed the question and the parties stipulated to the following answer: "The rules regarding aiding and abetting apply equally to all forms of homicide."

Defendant forfeited his appellate contention that the trial court's answer to the jury was wrong because he stipulated to the answer. (See *People v. Dykes* (2009) 46 Cal.4th 731, 802 (*Dykes*) [claim forfeited because defendant did not object to or request clarification of trial court's response to jury but instead agreed].) "When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal. [Citations.]" (*Ibid.*)

Defendant asserts we should not apply the forfeiture rule of *Dykes* because the trial court's answer was not "generally correct." Yet he does not explain how the court's answer, itself, was not generally correct. Instead, he attempts to establish that the court's answer failed to clear up for the jury the question as to how an aiding and abetting theory applies to voluntary manslaughter. Because defendant fails to establish that the court's answer was not "generally correct," he forfeited consideration of the issue on appeal by stipulating to the answer. (See *People v. Nilsson* (2015) 242 Cal.App.4th 1, 25 [defendant must object to generally correct answer to jury question to preserve issue for appeal].)

In any event, the trial court properly answered the question.

The jury may have been confused by the wording of the murder instructions as compared to the wording of the voluntary manslaughter instruction, both in connection with the aiding and abetting instructions.

The trial court instructed the jury generally that a defendant may be convicted on an aiding and abetting theory even if the defendant was not the direct perpetrator. (CALCRIM No. 400.) The court also instructed concerning the intent necessary for a conviction based on aiding and abetting, including the four elements of aiding and abetting: (1) a crime by a perpetrator, (2) defendant's knowledge that the perpetrator intended to commit the crime, (3) defendant's intention to aid and abet, and (4) actual aiding and abetting.[3] (CALCRIM No. 401.)

---

[3] As given, CALCRIM No. 401 stated:

"To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor." (Original italics.)

15

Concerning murder specifically, the trial court instructed: "In order to convict the defendant of murder under the theory of aiding and abetting, the aider and abettor must share the requisite specific intent with the perpetrator, as defined in the instructions for murder. An aider and abettor shares the perpetrator's specific intent when he knows the full extent of the perpetrator's criminal purpose and aids, facilitates, promotes, encourages, or instigates the crime with the intent or purpose of facilitating the perpetrator's commission of the crime."

The trial court did not give a similarly specific instruction concerning how to apply an aiding and abetting theory to voluntary manslaughter. And in the instruction on voluntary manslaughter, the court referred to the perpetrator as "the shooter." For example, the court instructed: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the shooter killed a person because he acted in imperfect self-defense or imperfect defense of another."

Since the trial court gave a specific instruction concerning aiding and abetting with respect to murder but not voluntary manslaughter (even though it gave correct, generally applicable aiding and abetting instructions) and the voluntary manslaughter instruction referred to "the shooter," it is understandable that the jury would have a question about whether defendant could be convicted of voluntary manslaughter under an aiding and abetting theory. The trial court simply responded that aiding and abetting applies to all forms of homicide. But defendant speculates that the jury may have misconceived how a person can be convicted of aiding and abetting a voluntary manslaughter.

Defendant argues: "The jury appeared to be confused about whether a person could be an aider and abettor if he harbored an actual but unreasonable belief in the danger posed, and then encouraged the shooter to take action to meet the perceived the danger." He wonders whether the jury believed his testimony that he did not know Williams was armed or that Williams intended to shoot but that defendant had an actual but unreasonable belief that Hatch was armed (seeing the "chrome") and did something

16

to encourage Williams to shoot.  Defendant continues:  "But suppose [defendant] only believed that Williams was going to wound, or disable, the victim, to prevent the victim from using the weapon?  Then [defendant] would only be liable if the killing of the victim was a 'natural and probable consequence' of the crime which [defendant] intended to aid and abet."

This conjecture does not establish error in the trial court's answer.  Again, the answer was generally correct.  If defendant wanted a more specific answer, he should have asked for it.  (*Dykes, supra,* 46 Cal.4th at p. 802.)  Also, the trial court instructed the jury on natural and probable consequences.  Defendant's speculation is insufficient to establish that the jury misapplied the law as a result of the trial court's instructions.

VI

*Asserted Admission of Speculative Matters*

Defendant contends that, during Brandy's (defendant's sister's) testimony, the trial court permitted the jury to hear speculative evidence by allowing an argumentative question and by admitting evidence over defendant's objection.  The contention is without merit.

A.  *Question About Kenyatta*

During questioning of Brandy, who was the driver of the black SUV during the incident, concerning how the second trip to the Econo Lodge came about, the following proceedings occurred:

"Q  Who went up into the apartment and got [defendant's brother] Kenyatta?

"A  Kenyatta wasn't in my mom [*sic*] apartment.

"Q  Where did he come from?

"A  Him, his girlfriend and girlfriend [*sic*] mother had just pulled up.

"Q  They coincidentally showed up there, too?

"A  Yes, ma'am.

17

"Q  All right.  So while you're in the parking lot for this gathering, [defendant] shows up and then Kenyatta shows up?

"A  Yes, ma'am.

"Q  And then Lorenzo shows up?

"A  Lorenzo wasn't there at the time.  Lorenzo showed up after we was driving out back to the Eco [*sic*] Lodge.  He was walking to my mom [*sic*] apartment and we picked him up.

"Q  He was just walking down the street, so you picked him up?

"A  He was walking from his girlfriend [*sic*] house to my mom's apartment.

"Q  Coincidentally?

"[DEFENSE COUNSEL:]  Objection, argumentative.

"THE COURT:  Overruled.

"[DEFENSE COUNSEL:]  Speculation, he was just walking up.

"THE COURT:  Overruled.  You can answer that.

"THE WITNESS:  Yes, ma'am.

"Q  [BY THE PROSECUTOR:]  Did you call him and say we are going back to the Eco [*sic*] Lodge?

"A  No, ma'am.

"Q  Nobody in your car texted Lorenzo.  He was just walking down the street at 7:00, 8:00 o'clock at night, according to your testimony?

"A  Yes, ma'am."

Defendant contends that the prosecutor's question concerning whether the coincidental nature of Kenyatta's arrival to accompany the others to the Econo Lodge the second time was argumentative and the objection should have been sustained.  He claims that the question "was clearly argument dressed up as a question."  We disagree.

"An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony.  Often it is apparent that the

18

questioner does not even expect an answer.  The question may, indeed, be unanswerable. . . .  An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)  We review rulings concerning argumentative questions for abuse of discretion only.  (*Ibid.*)

The prosecutor's question was not argumentative.  Instead, it was intended to elicit whether Kenyatta arrived as part of a plan to go together in force back to the Econo Lodge to confront Hatch.  The follow up question made that intent clear when the prosecutor asked whether anyone texted Kenyatta.  The trial court did not abuse its discretion by overruling the objection to the question.

B.      *Testimony Concerning Choice of Seat*

Later, still during the prosecutor's questioning of Brandy concerning the second trip to the Econo Lodge:

"Q  So if I understand you correctly, when you get in the car to leave the apartment, Lorenzo wasn't in the car yet, but Charles Williams climbs all the way into the back seat?

"A  Yes, ma'am

"Q  And leaves a seat [in the middle row] right next to [defendant] open?

"A  Yes, ma'am.

"Q  Is that where [defendant] had the AK-47 sitting next to him on the seat?

"A  I didn't see nothing in my car.

"Q  Why, to your knowledge, does Charles Williams crawl all the way into a third [seat] if there is an open [seat] next to [defendant]?

"[DEFENSE  COUNSEL:]  Objection, speculation.

"THE COURT:  If you know.

"THE WITNESS:  Because he does that.

19

"Q  [BY THE PROSECUTOR:]  That's just where he likes to ride?

"A  He does, yes, ma'am."

Defendant contends:  (1) the trial court abused its discretion in admitting Brandy's response concerning why Williams chose the third row seat and (2) the speculative nature of the testimony usurped the jury's function.

### 1.    *Speculation*

Evidence Code section 800 states that a lay witness may only testify with respect to an opinion "that is: [¶]  (a) Rationally based on the perception of the witness; and (b) Helpful to a clear understanding of his testimony."  A trial court's ruling that there is sufficient foundation for a lay witness's opinion testimony is reviewed for abuse of discretion.  "We review for an abuse of discretion a trial court's ruling that a question calls for speculation from a witness."  (*People v. Thornton* (2007) 41 Cal.4th 391, 429.)

Defendant contends that Brandy's testimony amounted to impermissible lay opinion because of the speculative nature of the testimony.  He argues:  "Brandy was speculating about what Williams' occult state of mind was.  The prosecution did not develop evidence that Brandy had any special training or experience which allowed her to determine what Williams was thinking when he sat himself down in the vehicle."  He claims it is " 'difficult to imagine a more tenuous chain of inference on which to base a finding . . .' [Citations.]"

To the contrary, Brandy apparently knew from personal experience or observation that Williams preferred to sit in the back row of seats.  Therefore, her inference and her opinion that he sat there because that is where he preferred to ride was not speculation.

### 2.    *Usurping the Jury's Function*

Defendant further contends that admission of Brandy's testimony concerning why Williams chose the back row of seats "usurped" the jury's function.  He argues:  "It was permissible for Brandy to explain what she observed Williams do upon entering the vehicle.  However the court allowed Brandy to go well beyond explaining such matters

20

and actually formed the jury's conclusion for them.  Instead of explaining what she observed, and permitting the jury to form their own conclusion about why Williams did what he did, Brandy left nothing to their discretion.  Brandy in effect told the jury what conclusion to reach."

We disagree that Brandy's statement of opinion concerning why Williams sat in the third row seat usurped the jury's function.  The jury had the duty to determine the facts and was not bound to believe Brandy or give credence to her opinion.  Brandy testified that it was Williams's practice to sit in the third row seat, and her opinion was based on that experience or observation.  The trial court did not abuse its discretion by admitting the evidence.

## VII

### *Admission of Hearsay*

Defendant contends the trial court abused its discretion by admitting hearsay evidence.  He argues that the court admitted evidence of a text message from Lorenzo to Brandy two days after the killing to the effect that the victim had been "erased."  The contention is without merit because no hearsay was admitted.

During the prosecution's cross-examination, Brandy, who had been the driver during the incident, testified as follows:

"Q  Now, after this incident occurred, you continued to have text messaging communication with Lorenzo and [defendant] about what had happened out there, right?

"A  Yes, yes, ma'am.

"Q  Because nobody was supposed to talk about what had happened out there, right?

"A  At that time I didn't know what had happened out there.  All I know I heard gunshots.  I thought somebody was trying to shoot at me, and I didn't even know what happened out there.

"Q  You didn't know what had happened out there?

21

"A  No, ma'am.

"Q  Isn't it true that your brother Lorenzo sent you a text message two days later and told you about the guy that you all had erased out there, that had been killed?

"[DEFENSE COUNSEL:]  Objection, hearsay.

"[PROSECUTOR:]  Well, it is a text message she received.

"THE COURT:  I assume it is not offered for the truth.

"[DEFENSE COUNSEL:]  Objection, relevance.

"THE COURT:  Effect on the hearer.  I'm going to overrule the objection.  Why don't you restate it.

"Q  [BY THE PROSECUTOR:]  Your testimony was just you didn't know what had happened out there, right?

"A  Yes, ma'am.

"Q  So my question to you is:  Don't you remember receiving a text message from your brother Lorenzo two days later when the guy that had been shot out there actually died?

"A  I don't remember a text message from me or from –

"Q  A text message from Lorenzo?

"A  Yes.

"Q  What do you remember about that text message?

"A  He said that Charles Williams was locked up.

"Q  And don't you remember that, that your brother Lorenzo talked about the guy having died?

"A  I don't remember.

"Q  Did you ever respond to the text message from Lorenzo about what had happened out there?

"A  No, ma'am."

In this exchange, the prosecutor asked Brandy whether she received a text message from Lorenzo that Hatch had been "erased." Defense counsel objected on hearsay and relevance grounds, but the trial court overruled the objection. So the prosecutor again asked the question, this time asking whether Brandy remembered receiving a text from Lorenzo that Hatch had "died." Brandy replied that, although she remembered a text from Lorenzo that Williams had been jailed, she did not remember Lorenzo texting her that Hatch had died.

In this exchange, the only possible hearsay admitted was that Williams had been jailed, not that Hatch had died. As the jury was instructed in this case, "[o]nly the witnesses' answers are evidence. The party's questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the parties asked a question that suggested it was true." (CALCRIM No. 222.)

Since there was no evidence that Lorenzo texted to Brandy that Hatch had been "erased," defendant's contention that the trial court abused its discretion by admitting this hearsay is without merit.[4]

---

[4] In his argument concerning this alleged hearsay, defendant fails to cite to the record. Instead, he claims, without record support, that the "trial court allowed the question (and answer) . . . ." Failure to cite to the record forfeits a contention. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743.)

DISPOSITION

The judgment is affirmed.


      NICHOLSON     , J.


We concur:


      RAYE          , P. J.


      BUTZ          , J.